# UNITED STATES *v.* PHILADELPHIA NATIONAL BANK ET AL.

No. 83.  Argued February 20–21, 1963.—Decided June 17, 1963.

*Assistant Attorney General Loevinger* argued the cause for the United States. With him on the briefs were *Solicitor General Cox, Charles H. Weston, George D. Reycraft, Lionel Kestenbaum* and *Melvin Spaeth.*

*Philip Price* and *Arthur Littleton* argued the cause for appellees. With them on the brief were *Ernest R. von Starck, Donald A. Scott, Carroll R. Wetzel, John J. Brennan* and *Minturn T. Wright III.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The United States, appellant here, brought this civil action in the United States District Court for the Eastern District of Pennsylvania under § 4 of the Sherman Act, 15 U. S. C. § 4, and § 15 of the Clayton Act, 15 U. S. C. § 25, to enjoin a proposed merger of The Philadelphia National Bank (PNB) and Girard Trust Corn Exchange Bank (Girard), appellees here. The complaint charged violations of § 1 of the Sherman Act, 15 U. S. C. § 1, and § 7 of the Clayton Act, 15 U. S. C. § 18.[1] From a judgment for appellees after trial, see 201 F. Supp. 348, the United States appealed to this Court under § 2 of the Expediting Act, 15 U. S. C. § 29. Probable jurisdiction was noted. 369 U. S. 883. We reverse the judgment of the District Court. We hold that the merger of appellees is forbidden by § 7 of the

---

[1] Section 1 of the Sherman Act provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." Section 7 of the Clayton Act, as amended in 1950 by the Celler-Kefauver Antimerger Act, provides in pertinent part: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

Clayton Act and so must be enjoined; we need not, and therefore do not, reach the further question of alleged violation of § 1 of the Sherman Act.

## I. THE FACTS AND PROCEEDINGS BELOW.

### A. *The Background: Commercial Banking in the United States.*

Because this is the first case which has required this Court to consider the application of the antitrust laws to the commercial banking industry, and because aspects of the industry and of the degree of governmental regulation of it will recur throughout our discussion, we deem it appropriate to begin with a brief background description.[2]

---

[2] The discussion in this portion of the opinion draws upon undisputed evidence of record in the case, supplemented by pertinent reference materials. See Board of Govs. of the Fed. Res. System, Financing Small Business (Comm. print 1958); The Federal Reserve System (3d ed. 1954); Concentration of Banking in the United States (Comm. print 1952); Bogen, The Competitive Position of Commercial Banks (1959); Commission on Money and Credit, Money and Credit (1961); Freeman, The Problems of Adequate Bank Capital (1952); Hart, Money, Debt, and Economic Activity (2d ed. 1953); Lent, The Changing Structure of Commercial Banking (1960); Sayers, Modern Banking (5th ed. 1960); Staff of House Select Comm. on Small Business, 86th Cong., 2d Sess., Banking Concentration and Small Business (1960); U. S. Attorney General's Comm. on Administrative Procedure, Federal Control of Banking (S. Doc. No. 186, 76th Cong., 3d Sess., 1940); Fox, Supervision of Banking by the Comptroller of the Currency, in Public Administration and Policy Formation (Redford ed. 1956), 117; Stokes, Public Convenience and Advantage in Applications for New Banks and Branches, 74 Banking L. J. 921 (1957). For materials which focus specifically on the question of competition in the banking industry, see also Alhadeff, Monopoly and Competition in Banking (1954); Chapman, Concentration of Banking (1934); Horvitz, Concentration and Competition in New England Banking

Commercial banking in this country is primarily unit banking. That is, control of commercial banking is diffused throughout a very large number of independent, local banks—13,460 of them in 1960—rather than concentrated in a handful of nationwide banks, as, for example, in England and Germany. There are, to be sure, in addition to the independent banks, some 10,000 branch banks; but branching, which is controlled largely by state law—and prohibited altogether by some States—enables a bank to extend itself only to state lines and often not that far.[3] It is also the case, of course, that many banks place loans and solicit deposits outside their home area. But with these qualifications, it remains true that ours is essentially a decentralized system of community banks. Recent years, however, have witnessed a definite trend toward concentration. Thus, during the decade ending in 1960 the number of commercial banks in the United

---

(1958); Lawrence, Banking Concentration in the United States (1930); Berle, Banking Under the Anti-Trust Laws, 49 Col. L. Rev. 589 (1949); Chandler, Monopolistic Elements in Commercial Banking, 46 J. Pol. Econ. 1 (1938); Gruis, Antitrust Laws and Their Application to Banking, 24 Geo. Wash. L. Rev. 89 (1955); Funk, Antitrust Legislation Affecting Bank Mergers, 12 Bus. Law. 496 (1957); Klebaner, Federal Control of Commercial Bank Mergers, 37 Ind. L. J. 287 (1962); Wemple and Cutler, The Federal Bank Merger Law and the Antitrust Laws, 16 Bus. Law. 994 (1961); Comment, Bank Charter, Branching, Holding Company and Merger Laws: Competition Frustrated, 71 Yale L. J. 502 (1962); Note, Federal Regulation of Bank Mergers: The Opposing Views of the Federal Banking Agencies and the Department of Justice, 75 Harv. L. Rev. 756 (1962).

[3] In addition, there is a certain amount of bank holding company activity. The Bank Holding Company Act of 1956, 12 U. S. C. §§ 1841–1848, brought bank holding companies under stringent federal regulation. As of 1958, the 43 registered bank holding companies controlled 5.7% of all banking offices and 7.4% of all deposits. Lent, The Changing Structure of Commercial Banking (1960), 19. See also Comment, *supra,* note 2, 71 Yale L. J., at 516–522.

States declined by 714, despite the chartering of 887 new banks and a very substantial increase in the Nation's credit needs during the period. Of the 1,601 independent banks which thus disappeared, 1,503, with combined total resources of well over $25,000,000,000, disappeared as the result of mergers.

Commercial banks are unique among financial institutions in that they alone are permitted by law to accept demand deposits. This distinctive power gives commercial banking a key role in the national economy. For banks do not merely deal in, but are actually a source of, money and credit; when a bank makes a loan by crediting the borrower's demand deposit account, it augments the Nation's credit supply.[4] Furthermore, the power to accept demand deposits makes banks the intermediaries in most financial transactions (since transfers of substantial moneys are almost always by check rather than by cash) and, concomitantly, the repositories of very substantial individual and corporate funds. The banks' use of these funds is conditioned by the fact that their working capital consists very largely of demand deposits, which makes liquidity the guiding principle of bank lending and investing policies; thus it is that banks are the chief source of the country's short-term business credit.

Banking operations are varied and complex; "commercial banking" describes a congeries of services and credit devices.[5] But among them the creation of additional

---

[4] Such creation is not, to be sure, pure sleight of hand. A bank may not make a loan without adequate reserves. Nevertheless, the element of bank money creation is real. *E. g.*, Samuelson, Economics (5th ed. 1961), 331–343.

[5] The principal banking "products" are of course various types of credit, for example: unsecured personal and business loans, mortgage loans, loans secured by securities or accounts receivable, automobile installment and consumer goods installment loans, tuition financing, bank credit cards, revolving credit funds. Banking services include: acceptance of demand deposits from individuals, corporations, gov-

money and credit, the management of the checking-account system, and the furnishing of short-term business loans would appear to be the most important. For the proper discharge of these functions is indispensable to a healthy national economy, as the role of bank failures in depression periods attests. It is therefore not surprising that commercial banking in the United States is subject to a variety of governmental controls, state and federal. Federal regulation is the more extensive, and our focus will be upon it. It extends not only to the national banks, *i. e.*, banks chartered under federal law and supervised by the Comptroller of the Currency, see 12 U. S. C. § 21 *et seq.* For many state banks, see 12 U. S. C. § 321, as well as virtually all the national banks, 12 U. S. C. § 222, are members of the Federal Reserve System (FRS), and more than 95% of all banks, see 12 U. S. C. § 1815, are insured by the Federal Deposit Insurance Corporation (FDIC). State member and nonmember insured banks are subject to a federal regulatory scheme almost as elaborate as that which governs the national banks.

The governmental controls of American banking are manifold. First, the Federal Reserve System, through its open-market operations, see 12 U. S. C. §§ 263 (c), 353–359, control of the rediscount rate, see 12 U. S. C. § 357, and modifications of reserve requirements, see 12 U. S. C.

ernmental agencies, and other banks; acceptance of time and savings deposits; estate and trust planning and trusteeship services; lock boxes and safety-deposit boxes; account reconciliation services; foreign department services (acceptances and letters of credit); correspondent services; investment advice. It should be noted that many other institutions are in the business of supplying credit, and so more or less in competition with commercial banks (see further, pp. 356–357, *infra*), for example: mutual savings banks, savings and loan associations, credit unions, personal-finance companies, sales-finance companies, private businessmen (through the furnishing of trade credit), factors, direct-lending government agencies, the Post Office, Small Business Investment Corporations, life insurance companies.

§§ 462, 462b, regulates the supply of money and credit in the economy and thereby indirectly regulates the interest rates of bank loans. This is not, however, rate regulation. The Reserve System's activities are only designed to influence the prime, *i. e.,* minimum, bank interest rate. There is no federal control of the maximum, although all banks, state and national, are subject to state usury laws where applicable. See 12 U. S. C. § 85. In the range between the maximum fixed by state usury laws and the practical minimum set by federal fiscal policies (there is no law against undercutting the prime rate but bankers seldom do), bankers are free to price their loans as they choose. Moreover, charges for other banking services, such as service charges for checking privileges, are free of governmental regulation, state or federal.

Entry, branching, and acquisitions are covered by a network of state and federal statutes. A charter for a new bank, state or national, will not be granted unless the invested capital and management of the applicant, and its prospects for doing sufficient business to operate at a reasonable profit, give adequate protection against undue competition and possible failure. See, *e. g.,* 12 U. S. C. §§ 26, 27, 51; 12 CFR § 4.1 (b); Pa. Stat. Ann., Tit. 7, § 819–306. Failure to meet these standards may cause the FDIC to refuse an application for insurance, 12 U. S. C. §§ 1815, 1816, and may cause the FDIC, Federal Reserve Board (FRB), and Comptroller to refuse permission to branch to insured, member, and national banks, respectively. 12 U. S. C. §§ 36, 321, 1828 (d). Permission to merge, consolidate, acquire assets, or assume liabilities may be refused by the agencies on the same grounds. 12 U. S. C. (1958 ed., Supp. IV) § 1828 (c), note 8, *infra.* Furthermore, national banks appear to be subject to state geographical limitations on branching. See 12 U. S. C. § 36 (c).

Banks are also subject to a number of specific provisions aimed at ensuring sound banking practices. For example, member banks of the Federal Reserve System may not pay interest on demand deposits, 12 U. S. C. § 371a, may not invest in common stocks or hold for their own account investment securities of any one obligor in excess of 10% of the bank's unimpaired capital and surplus, see 12 U. S. C. §§ 24 Seventh, 335, and may not pay interest on time or savings deposits above the rate fixed by the FRB, 12 U. S. C. § 371b. The payment of interest on deposits by nonmember insured banks is also federally regulated. 12 U. S. C. (1958 ed., Supp. IV) § 1828 (g); 12 CFR, 1962 Supp., Part 329. In the case of national banks, the 10% limit on the obligations of a single obligor includes loans as well as investment securities. See 12 U. S. C. § 84. Pennsylvania imposes the same limitation upon banks chartered under its laws, such as Girard. Pa. Stat. Ann. (1961 Supp.), Tit. 7, § 819–1006.

But perhaps the most effective weapon of federal regulation of banking is the broad visitatorial power of federal bank examiners. Whenever the agencies deem it necessary, they may order "a thorough examination of all the affairs of the bank," whether it be a member of the FRS or a nonmember insured bank. 12 U. S. C. §§ 325, 481, 483, 1820 (b); 12 CFR § 4.2. Such examinations are frequent and intensive. In addition, the banks are required to furnish detailed periodic reports of their operations to the supervisory agencies. 12 U. S. C. §§ 161, 324, 1820 (e). In this way the agencies maintain virtually a day-to-day surveillance of the American banking system. And should they discover unsound banking practices, they are equipped with a formidable array of sanctions. If in the judgment of the FRB a member bank is making "undue use of bank credit," the Board may suspend the bank from the use of the credit facilities of the FRS. 12 U. S. C. § 301. The FDIC has an even more formidable

power. If it finds "unsafe or unsound practices" in the conduct of the business of any insured bank, it may terminate the bank's insured status. 12 U. S. C. § 1818 (a). Such involuntary termination severs the bank's membership in the FRS, if it is a state bank, and throws it into receivership if it is a national bank. 12 U. S. C. § 1818 (b). Lesser, but nevertheless drastic, sanctions include publication of the results of bank examinations. 12 U. S. C. §§ 481, 1828 (f). As a result of the existence of this panoply of sanctions, recommendations by the agencies concerning banking practices tend to be followed by bankers without the necessity of formal compliance proceedings. 1 Davis, Administrative Law (1958), § 4.04.

Federal supervision of banking has been called "[p]robably the outstanding example in the federal government of regulation of an entire industry through methods of supervision . . . . The system may be one of the most successful [systems of economic regulation], if not the most successful." *Id.*, § 4.04, at 247. To the efficacy of this system we may owe, in part, the virtual disappearance of bank failures from the American economic scene.[6]

## B. *The Proposed Merger of PNB and Girard.*

The Philadelphia National Bank and Girard Trust Corn Exchange Bank are, respectively, the second and third largest of the 42 commercial banks with head offices in the Philadelphia metropolitan area, which consists of the City of Philadelphia and its three contiguous counties in Pennsylvania. The home county of both banks is the

---

[6] In 1957, for example, there were three bank suspensions in the entire country by reason of financial difficulties; in 1960, two; and in 1961, nine. Of these nine, four involved state banks which were neither members of the FRS nor insured by the FDIC. 1961 Annual Report of the Comptroller of the Currency 286. In a typical year in the 1920's, roughly 600 banks failed throughout the country, about 100 of them national banks. See S. Rep. No. 196, Regulation of Bank Mergers, 86th Cong., 1st Sess. 17–18.

city itself; Pennsylvania law, however, permits branching into the counties contiguous to the home county, Pa. Stat. Ann. (1961 Supp.), Tit. 7, § 819–204.1, and both banks have offices throughout the four-county area. PNB, a national bank, has assets of over $1,000,000,000, making it (as of 1959) the twenty-first largest bank in the Nation. Girard, a state bank, is a member of the FRS and is insured by the FDIC; it has assets of about $750,000,000. Were the proposed merger to be consummated, the resulting bank would be the largest in the four-county area, with (approximately) 36% of the area banks' total assets, 36% of deposits, and 34% of net loans. It and the second largest (First Pennsylvania Bank and Trust Company, now the largest) would have between them 59% of the total assets, 58% of deposits, and 58% of the net loans, while after the merger the four largest banks in the area would have 78% of total assets, 77% of deposits, and 78% of net loans.

The present size of both PNB and Girard is in part the result of mergers. Indeed, the trend toward concentration is noticeable in the Philadelphia area generally, in which the number of commercial banks has declined from 108 in 1947 to the present 42. Since 1950, PNB has acquired nine formerly independent banks and Girard six; and these acquisitions have accounted for 59% and 85% of the respective banks' asset growth during the period, 63% and 91% of their deposit growth, and 12% and 37% of their loan growth. During this period, the seven largest banks in the area increased their combined share of the area's total commercial bank resources from about 61% to about 90%.

In November 1960 the boards of directors of the two banks approved a proposed agreement for their consolidation under the PNB charter. By the terms of the agreement, PNB's stockholders were to retain their share certificates, which would be deemed to represent an equal

number of shares in the consolidated bank, while Girard's stockholders would surrender their shares in exchange for shares in the consolidated bank, receiving 1.2875 such shares for each Girard share. Such a consolidation is authorized, subject to the approval of the Comptroller of the Currency, by 12 U. S. C. (1958 ed., Supp. IV) § 215.[7] But under the Bank Merger Act of 1960, 12 U. S. C. (1963 ed., Supp. IV) § 1828 (c), the Comptroller may not give his approval until he has received reports from the other two banking agencies and the Attorney General respecting the probable effects of the proposed transaction on competition.[8] All three reports advised that the pro-

---

[7] The proposed "merger" of appellees is technically a consolidation, since the resulting bank will be a different entity from either of the constituent banks, whereas if the transaction were a merger, Girard would disappear into PNB and PNB would survive. However, the proposed transaction resembles a merger very closely, in that PNB's shareholders are not to surrender their present share certificates and the resulting bank is to operate under PNB's charter. In any event, the statute treats mergers and consolidations essentially alike, compare 12 U. S. C. (1958 ed., Supp. IV) § 215 with § 215a, and it is not suggested that the legal question of the instant case would be affected by whether the transaction is technically a merger or a consolidation. Therefore, throughout this opinion we use the term "merger."

[8] Section 1828 (c) provides in pertinent part:
"No insured [by FDIC] bank shall merge or consolidate with any other insured bank or, either directly or indirectly, acquire the assets of, or assume liability to pay any deposits made in, any other insured bank without the prior written consent (i) of the Comptroller of the Currency if the acquiring, assuming, or resulting bank is to be a national bank or a District [of Columbia] bank, or (ii) of the Board of Governors of the Federal Reserve System if the acquiring, assuming, or resulting bank is to be a State member bank (except a District bank), or (iii) of the [Federal Deposit Insurance] Corporation if the acquiring, assuming, or resulting bank is to be a non-member insured bank (except a District bank). . . . In granting or withholding consent under this subsection, the Comptroller, the Board, or the Corporation, as the case may be, shall consider the financial history and condition of each of the banks involved, the adequacy of its capital structure, its future earnings prospects, the

posed merger would have substantial anticompetitive effects in the Philadelphia metropolitan area. However, on February 24, 1961, the Comptroller approved the merger. No opinion was rendered at that time. But as required by § 1828 (c), the Comptroller explained the basis for his decision to approve the merger in a statement to be included in his annual report to Congress. As to effect upon competition, he reasoned that "[s]ince there will remain an adequate number of alternative sources of banking service in Philadelphia, and in view of the beneficial effects of this consolidation upon international and national competition it was concluded that the over-all effect upon competition would not be unfavorable." He also stated that the consolidated bank "would be far better able to serve the convenience and needs of its community by being of material assistance to its city and state in their efforts to attract new industry and to retain existing industry." The day after the Comptroller approved the

---

general character of its management, the convenience and needs of the community to be served; and whether or not its corporate powers are consistent with the purposes of this chapter. In the case of a merger, consolidation, acquisition of assets, or assumption of liabilities, the appropriate agency shall also take into consideration the effect of the transaction on competition (including any tendency toward monopoly), and shall not approve the transaction unless, after considering all of such factors, it finds the transaction to be in the public interest. In the interests of uniform standards, before acting on a merger, consolidation, acquisition of assets, or assumption of liabilities under this subsection, the agency (unless it finds that it must act immediately in order to prevent the probable failure of one of the banks involved) shall request a report on the competitive factors involved from the Attorney General and the other two banking agencies referred to in this subsection . . . . The Comptroller, the Board, and the Corporation shall each include in its annual report to the Congress a description of each merger, consolidation, acquisition of assets, or assumption of liabilities approved by it during the period covered by the report, along with the following information: . . . a statement by the Comptroller, the Board, or the Corporation, as the case may be, of the basis for its approval."

merger, the United States commenced the present action. No steps have been taken to consummate the merger pending the outcome of this litigation.

C. *The Trial and the District Court's Decision.*

The Government's case in the District Court relied chiefly on statistical evidence bearing upon market structure and on testimony by economists and bankers to the effect that, notwithstanding the intensive governmental regulation of banking, there was a substantial area for the free play of competitive forces; that concentration of commercial banking, which the proposed merger would increase, was inimical to that free play; that the principal anticompetitive effect of the merger would be felt in the area in which the banks had their offices, thus making the four-county metropolitan area the relevant geographical market; and that commercial banking was the relevant product market. The defendants, in addition to offering contrary evidence on these points, attempted to show business justifications for the merger. They conceded that both banks were economically strong and had sound management, but offered the testimony of bankers to show that the resulting bank, with its greater prestige and increased lending limit,[9] would be better able to compete with large out-of-state (particularly New York) banks, would attract new business to Philadelphia, and in general would promote the economic development of the metropolitan area.[10]

---

[9] See 12 U. S. C. § 84, p. 329, *supra.* The resulting bank would have a lending limit of $15,000,000, of which $1,000,000 would not be attributable to the merger but to unrelated accounting factors.

[10] There was evidence that Philadelphia, although it ranks fourth or fifth among the Nation's urban areas in terms of general commercial activity, ranks only ninth in terms of the size of its largest bank, and that some large business firms which have their head offices in Philadelphia must seek elsewhere to satisfy their banking needs because of the inadequate lending limits of Philadelphia's

Upon this record, the District Court held that: (1) the passage of the Bank Merger Act of 1960 did not repeal by implication the antitrust laws insofar as they may apply to bank mergers; (2) § 7 of the Clayton Act is inapplicable to bank mergers because banks are not corporations "subject to the jurisdiction of the Federal Trade Commission"; (3) but assuming that § 7 is applicable, the four-county Philadelphia metropolitan area is not the relevant geographical market because PNB and Girard actively compete with other banks for bank business throughout the greater part of the northeastern United States; (4) but even assuming that § 7 is applicable and that the four-county area is the relevant market, there is no reasonable probability that competition among commercial banks in the area will be substantially lessened as the result of the merger; (5) since the merger does not violate § 7 of the Clayton Act, *a fortiori* it does not violate § 1 of the Sherman Act; (6) the merger will benefit the Philadelphia metropolitan area economically. The District Court also ruled that for the purposes of § 7, commercial banking is a line of commerce; the appellees do not contest this ruling.

## II. THE APPLICABILITY OF SECTION 7 OF THE CLAYTON ACT TO BANK MERGERS.

### A. *The Original Section and the 1950 Amendment.*

By its terms, the present § 7 reaches acquisitions of corporate stock or share capital by any corporation engaged

---

banks; First Pennsylvania and PNB, currently the two largest banks in Philadelphia, each have a lending limit of $8,000,000. Girard's is $6,000,000.

Appellees offered testimony that the merger would enable certain economies of scale, specifically, that it would enable the formation of a more elaborate foreign department than either bank is presently able to maintain. But this attempted justification, which was not mentioned by the District Court in its opinion and has not been developed with any fullness before this Court, we consider abandoned.

in commerce, but it reaches acquisitions of corporate assets only by corporations "subject to the jurisdiction of the Federal Trade Commission." The FTC, under § 5 of the Federal Trade Commission Act, has no jurisdiction over banks. 15 U. S. C. § 45 (a) (6).[11] Therefore, if the proposed merger be deemed an assets acquisition, it is not within § 7.[12] Appellant argues vigorously that a merger is crucially different from a pure assets acquisition,[13] and

[11] We reject the argument that § 11 of the Clayton Act, as amended, 15 U. S. C. § 21, confers jurisdiction over banks upon the FTC. That section provides in pertinent part: "Authority to enforce compliance with sections 13, 14, 18, and 19 of this title [§§ 2, 3, 7, and 8 of the Clayton Act, as amended] by the persons respectively subject thereto is vested . . . in the Federal Reserve Board where applicable to banks, banking associations, and trust companies; and in the Federal Trade Commission where applicable to all other character of commerce . . . ." The argument is that since the FRB has no authority to enforce the Clayton Act against bank mergers, see note 22, infra, bank mergers must fall into the residual category of "all other character of commerce" and so be subject to the FTC. However, there is no intimation in the legislative history of the 1950 amendment to §§ 7 and 11 that the FTC's traditional lack of jurisdiction over banks was to be disturbed. Moreover, it is clear from the language of § 11 that "banks, banking associations, and trust companies" are meant to comprise a distinct "character of commerce," and so cannot be part of the "other character of commerce" reserved to the FTC.

The exclusion of banks from the FTC's jurisdiction appears to have been motivated by the fact that banks were already subject to extensive federal administrative controls. See *T. C. Hurst & Son* v. *Federal Trade Comm'n,* 268 F. 874, 877 (D. C. E. D. Va. 1920).

[12] No argument is made in this case that banking is not commerce, and therefore that § 7 is inapplicable; plainly, such an argument would have no merit. See *Transamerica Corp.* v. *Board of Govs. of Fed. Res. Sys.,* 206 F. 2d 163, 166 (C. A. 3d Cir. 1953); cf. *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533.

[13] "A merger necessarily involves the complete disappearance of one of the merging corporations. A sale of assets, on the other hand, may involve no more than a substitution of cash for some part of the selling company's properties, with no change in corporate structure and no change in stockholder interests. Shareholders of merging

appellees argue with equal vigor that it is crucially differ-
ent from a pure stock acquisition.[14]   Both positions, we
think, have merit; a merger fits neither category neatly.
Since the literal terms of § 7 thus do not dispose of our
question, we must determine whether a congressional de-
sign to embrace bank mergers is revealed in the history of
the statute.   The question appears to be one of first im-
pression; we have been directed to no previous case in
which a merger or consolidation was challenged under § 7
of the Clayton Act, as amended, where the acquiring cor-
poration was not subject to the FTC's jurisdiction.

When it was first enacted in 1914, § 7 referred only to
corporate acquisitions of stock and share capital; it was
silent as to assets acquisitions and as to mergers and con-

corporations surrender their interests in those corporations in ex-
change for their very different rights in the resulting corporation.   In
an asset acquisition, however, the shareholders of the selling corpo-
ration obtain no interest in the purchasing corporation and retain no
interest in the assets transferred.   In a merger, unlike an asset
acquisition, the resulting firm automatically acquires all the rights,
powers, franchises, liabilities, and fiduciary rights and obligations of
the merging firms.   In a merger, but not in an asset acquisition, there
is the likelihood of a continuity of management and other personnel.
Finally, a merger, like a stock acquisition, necessarily involves the
acquisition by one corporation of an immediate voice in the man-
agement of the business of another corporation; no voice in the deci-
sions of another corporation is acquired by purchase of some part
of its assets."   Brief for the United States, 75–76.

[14] "[A] merger such as appellees' may be effected upon the affirma-
tive vote of the holders of only two-thirds of the outstanding stock of
each bank . . . but if PNB were acquiring all of the Girard stock
each Girard shareholder could decide for himself whether to transfer
his shares.   A merger requires public notice whereas stock can be
acquired privately.   A shareholder dissenting from a merger has the
right to receive the appraised value of his shares . . . whereas no
shareholder has a comparable right in an acquisition of stock.   Fur-
thermore the corporate existence of a merged company is terminated
by a merger, but remains unaffected by an acquisition of stock."
Brief for Appellees, 30–31.

solidations. Act of October 15, 1914, c. 323, § 7, 38 Stat. 731–732, note 18, *infra*. It is true that the omission may not have been an oversight. Congress' principal concern was with the activities of holding companies, and specifically with the practice whereby corporations secretly acquired control of their competitors by purchasing the stock of those companies. Although assets acquisitions and mergers were known forms of corporate amalgamation at the time, their no less dangerously anticompetitive effects may not have been fully apparent to the Congress.[15] Still, the statutory language, read in the light of the overriding congressional purpose to control corporate concentrations tending to monopoly, lent itself to a construction whereby § 7 would have reached at least mergers and consolidations. It would hardly have done violence to the language so to have interpreted the vague term "share capital," see. 30 Geo. Wash. L. Rev. 1024, 1027–1028 (1962), or to have adopted the view that: "where the assets are exchanged for the stock of the purchasing company, assuming that the two companies were previously in competition, it is apparent that the seller has acquired stock in a competing company . . . [and] therefore, that in effecting the merger section 7 was violated and hence the distribution of the stock received by the selling company to its shareholders and its subsequent dissolution are no bar to proceedings by the government to set aside the purchase." Handler, Industrial Mergers and the Anti-Trust Laws, 32 Col. L. Rev. 179, 266 (1932).[16]

But the courts found mergers to be beyond the reach of § 7, even when the merger technique had supplanted

---

[15] The legislative history of the 1914 Act is reviewed in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 313–314, and notes 22–24.

[16] In the case of an acquisition like the instant one, in which shares in the acquired corporation are to be exchanged for shares in the resulting corporation, *a fortiori* we discern no difficulty in conceptualizing the transaction as a "stock acquisition." Compare note 13, *supra.*

stock acquisitions as the prevalent mode of corporate amalgamation. *United States* v. *Celanese Corp. of America,* 91 F. Supp. 14 (D. C. S. D. N. Y. 1950); see *Thatcher Mfg. Co.* v. *Federal Trade Comm'n* and *Swift & Co.* v. *Federal Trade Comm'n,* decided together with *Federal Trade Comm'n* v. *Western Meat Co.,* 272 U. S. 554; *Arrow-Hart & Hegeman Elec. Co.* v. *Federal Trade Comm'n,* 291 U. S. 587.[17]   As a result, § 7 became largely

---

[17] Statements to the same effect may be found in, *e. g., Brown Shoe Co., supra,* at 313–314, 316; *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 592; *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 507, n. 7; *United States* v. *Columbia Pictures Corp.,* 189 F. Supp. 153, 182 (D. C. S. D. N. Y. 1960). See also 33 Op. Atty. Gen. 225, 241 (1922); Hernacki, Mergerism and Section 7 of the Clayton Act, 20 Geo. Wash. L. Rev. 659, 676–677 (1952); Wemple and Cutler, The Federal Bank Merger Law and the Antitrust Laws, 16 Bus. Law. 994, 999–1000 (1961); Note, Section 7 of the Clayton Act: A Legislative History, 52 Col. L. Rev. 766, 768–769 (1952).

Actually, the holdings in the three cases that reached this Court, *Thatcher, Swift,* and *Arrow-Hart,* were quite narrow. See generally Note, 26 Col. L. Rev. 594–596 (1926). They were based not on a lack of substantive power under § 7, but on the enforcement section, § 11, which limited the FTC's remedial powers to "an order requiring such person to cease and desist from such violations [of §§ 2, 3, 7, and 8 of the Clayton Act], and divest itself of the stock held or rid itself of the directors chosen contrary to the provisions of sections seven and eight of this Act." 38 Stat. 735. Faced with Congress' evident refusal to confer upon the FTC the ordinary powers of a court of equity, this Court held that unless the assets were acquired after the FTC's order of stock divestiture had been issued (which was the case in *Federal Trade Comm'n* v. *Western Meat Co., supra,* where the Commission was sustained), the Commission could not order a divestiture of assets. Compare *Board of Govs. of Fed. Res. Sys.* v. *Transamerica Corp.,* 184 F. 2d 311 (C. A. 9th Cir. 1950), with *Federal Trade Comm'n* v. *International Paper Co.,* 241 F. 2d 372 (C. A. 2d Cir. 1956). Since under this Court's decisions the FTC was powerless even where the transfer of assets was an evasive maneuver aimed at defeating the FTC's remedial jurisdiction over stock acquisitions violative of § 7, *a fortiori* the Commission was powerless against the typical merger. See *Arrow-Hart & Hegeman Elec. Co.* v. *Fed-*

a dead letter. Comment, 68 Yale L. J. 1627, 1629–1630 (1959); see Federal Trade Commission, The Merger Movement: A Summary Report (1948), 1, 3–6; Henderson, The Federal Trade Commission (1924), 40. Meanwhile, this Court's decision in *United States* v. *Columbia Steel Co.*, 334 U. S. 495, stirred concern whether the Sherman Act alone was a check against corporate acquisitions. Note, 52 Col. L. Rev. 766, 768 (1952).

It was against this background that Congress in 1950 amended § 7 to include an assets-acquisition provision. Act of December 29, 1950 (Celler-Kefauver Antimerger Act), c. 1184, 64 Stat. 1125–1126, 15 U. S. C. § 18.[18]

---

*eral Trade Comm'n, supra,* at 595, 598–599. As part of the 1950 amendments to the Clayton Act, § 11 was amended to read: "an order requiring such person to . . . divest itself of the stock, or other share capital, or assets, held . . . ." 15 U. S. C. § 21. Whether as an original matter *Thatcher, Swift* and *Arrow-Hart* were correctly decided is no longer an open question, since they were the explicit premise of the 1950 amendment to § 7. See *State Bd. of Ins.* v. *Todd Shipyards Corp.*, 370 U. S. 451, 458, p. 349, *infra*.

The question of the FTC's remedial powers under § 11 of the Clayton Act is to be distinguished from that of its remedial powers under § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45 (b). In *Federal Trade Comm'n* v. *Eastman Kodak Co.*, 274 U. S. 619, the Court, relying on *Thatcher* and *Swift,* held that the Commission had no power to order divestiture in § 5 proceedings. But cf. *Gilbertville Trucking Co.* v. *United States,* 371 U. S. 115, 129–131; *Pan American World Airways* v. *United States,* 371 U. S. 296, 312, and n. 17.

[18] See note 1, *supra,* for text of amended § 7. The original § 7 read in pertinent part: "no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

The passage of the 1950 amendment followed many years of unsuccessful attempts to enact legislation plugging the assets-acquisition

The legislative history is silent on the specific questions why the amendment made no explicit reference to mergers, why assets acquisitions by corporations not subject to FTC jurisdiction were not included, and what these omissions signify. Nevertheless, the basic congressional design clearly emerges and from that design the answers to these questions may be inferred. Congress primarily sought to bring mergers within § 7 and thereby close what it regarded as a loophole in the section.[19] But, in addition, it sought to reach transactions such as that involved in *Columbia Steel*, which was a simple purchase

loophole. See Note, 52 Col. L. Rev. 766–767, notes 3 and 4 (1952). To be sure, the 1950 amendment was intended not only to enlarge the number of transactions covered by § 7 but also to change the test of illegality. The legislative history pertinent to the latter point is reviewed in *Brown Shoe Co., supra,* at 315–323, and is not directly relevant to the present discussion.

[19] "The purpose of the proposed legislation [the 1950 amendments to § 7] is to prevent corporations from acquiring another corporation by means of the acquisition of its assets, whereunder [*sic*] the present law it is prohibited from acquiring the stock of said corporation. Since the acquisition of stock is significant chiefly because it is likely to result in control of the underlying assets, failure to prohibit direct purchase of the same assets has been inconsistent and paradoxical as to the over-all effect of existing law." S. Rep. No. 1775, 81st Cong., 2d Sess. 2. This theme pervaded congressional consideration of the proposed amendments. See, *e. g.,* H. R. Rep. No. 1191, 81st Cong., 1st Sess., *passim;* Hearing before Subcommittee No. 3 of the House Committee on the Judiciary on Amending Sections 7 and 11 of the Clayton Act, 81st Cong., 1st Sess., ser. 10, pp. 11–13, 28–29, 39, 117; Hearings before a Subcommittee of the Senate Committee on the Judiciary on Corporate Mergers and Acquisitions, 81st Cong., 1st and 2d Sess. 4–5, 15, 20, 62–63, 126–129, 139, 321; 95 Cong. Rec. 11485 (Congressman Celler, sponsor of the bill to amend § 7 in the House: "this bill seeks to plug a loophole in the present antitrust laws. . . . It is time to stop, look, and listen and to call a halt to the merger movement that is going on in this country"), 11493–11494, 11497, 11502; 96 Cong. Rec. 16433, 16443.

of assets and not a merger.[20]  In other words, Congress contemplated that the 1950 amendment would give § 7 a reach which would bring the entire range of corporate amalgamations, from pure stock acquisitions to pure assets acquisitions, within the scope of § 7.  Thus, the stock-acquisition and assets-acquisition provisions, *read together,* reach mergers, which fit neither category perfectly but lie somewhere between the two ends of the spectrum.  See pp. 336–337, and notes 13, 14, *supra.*  So construed, the specific exception for acquiring corporations not subject to the FTC's jurisdiction excludes from the coverage of § 7 only assets acquisitions by such corporations when not accomplished by merger.

---

[20] *Columbia Steel* involved the cash purchase by United States Steel Corporation of the physical assets of Consolidated Steel Corporation; there was no exchange of shares and no alteration of Consolidated's corporate identity.  See Transcript of Record, *United States v. Columbia Steel Co.,* 334 U. S. 495 (No. 461, October Term, 1947), pp. 453–475.  As a result of the purchase, in its horizontal aspect, U. S. Steel controlled about 24% of the structural steel fabricating market in an 11-state western area.  This Court held that the acquisition could not be reached under § 7 of the Clayton Act, see 334 U. S., at 507, n. 7, and did not violate the Sherman Act.  It should be noted, however, that the Court regarded the 24% market-share figure proposed by the Government as a "doubtful assumption" and also pointed to "unusual conditions" tending to mitigate the anticompetitive effect of the acquisition. · 334 U. S., at 529.  *Columbia Steel* was repeatedly cited by Congressmen considering the amendment of § 7 as an example of what they conceived to be the inability of the Sherman Act, as then construed, to deal with the problems of corporate concentration.  See, *e. g.,* H. R. Rep. No. 1191, 81st Cong., 1st Sess. 10–11, and n. 16; Hearing before Subcommittee No. 3 of the House Committee on the Judiciary on Amending Sections 7 and 11 of the Clayton Act, 81st Cong., 1st Sess., ser. 10, pp. 28, 73; Hearings before a Subcommittee of the Senate Committee on the Judiciary on Corporate Mergers and Acquisitions, 81st Cong., 1st and 2d Sess. 24; 96 Cong. Rec. 16453 (Senator Kefauver, Senate sponsor of the bill to amend § 7: "the Columbia Steel Co. case is a vivid illustration of the necessity for the proposed amendment of the Clayton Act"), 16503; and cf. 96 Cong. Rec. 16498–16499.

This construction is supported by a number of specific considerations.

*First.* Any other construction would be illogical and disrespectful of the plain congressional purpose in amending § 7, because it would create a large loophole in a statute designed to close a loophole. It is unquestioned that the stock-acquisition provision of § 7 embraces every corporation engaged in commerce, including banks. And it is plain that Congress, in amending § 7, considered a distinction for antitrust purposes between acquisition of corporate control by purchase of stock and acquisition by merger unsupportable in reason, and sought to overrule the decisions of this Court which had recognized such a distinction.[21] If, therefore, mergers in industries outside

---

[21] See note 19, *supra.* The congressional attitude toward this Court's *Thatcher, Swift,* and *Arrow-Hart* decisions is typified in this remark of Senator O'Conor's: "The Court, in effect, said that the [Federal Trade] Commission was quite free to use the power which Congress had conferred upon it, so long as it confined the use of that power to ordering the divestiture of pieces of paper which happened to be worthless." 96 Cong. Rec. 16433. Senator O'Mahoney remarked, for example, that there was "no doubt of the fundamental fact that an innocent defect in the drafting of section 7 of the Clayton Act back in 1914 had resulted in creating a great opportunity for escape by flagrant violators of the law." 96 Cong. Rec. 16443. After sharply criticizing this Court's decisions, the Senator continued: "I take it the record is perfectly clear that what this bill purports to do is to correct an omission in the original Clayton Act. When the authors of the Clayton Act and the Congress which passed it enacted the bill into law they thought they were giving the Federal Trade Commission administrative authority to prevent monopolistic mergers . . . ." *Ibid.* . So also, Senator Kefauver observed: "it would have been much better for the economy of the country to have repealed sections 7 and 11 of the Clayton Act rather than let this wide-open loophole to remain. Most of the large and monopolistic mergers which have become detrimental to the free-enterprise system of our Nation have occurred by way of this plain evasion of the intent of the original Clayton Act." 96 Cong. Rec. 16451.

the FTC's jurisdiction were deemed beyond the reach of § 7, the result would be precisely that difference in treatment which Congress rejected. On the other hand, excluding from the section assets acquisitions not by merger in those industries does not appear to create a lacuna of practical importance.[22]

---

[22] A cash purchase of another bank's assets would not seem to be a fully effective method of corporate acquisition. In other industries, a cash purchase of plant, inventory, patents, trade secrets, and the like will often directly enhance the competitive position of the acquiring corporation, as in *Columbia Steel Co*. But a bank desiring to increase its share of banking business through corporate acquisition would ordinarily need to acquire the other bank's deposits and capital, not merely its assets. For more deposits mean more working capital, and additions to capital and surplus increase the lending limit. A cash purchase, in effect, only substitutes cash for cash, since bank assets consist principally of cash and very liquid securities and loans receivable, and adds nothing to the acquiring bank's capital and surplus or to its working capital. True, an exchange of its stock for assets would achieve the acquiring bank's objectives. We are clear, however, that in light of Congress' overriding purpose, in amending § 7, to close the loophole in the original section, if such an exchange (or other clearly evasive transaction) were tantamount in its effects to a merger, the exchange would not be an "assets" acquisition within the meaning of § 7 but would be treated as a transaction subject to that section.

We have not overlooked the fact that there are corporations in other industries not subject to the FTC's jurisdiction. Chief among these are air carriers subject to the Civil Aeronautics Board and other carriers subject to the Interstate Commerce Commission. Both agencies have been given, expressly, broad powers to exempt mergers and acquisitions in whatever form from the antitrust laws. See 49 U. S. C. §§ 1378, 1384; 49 U. S. C. § 5 (11) and (13). Therefore, the exclusion of assets acquisitions in such industries from § 7 would seem to have little significance.

Section 11 of the Clayton Act, 15 U. S. C. § 21, vests the FRB with authority to enforce § 7 "where applicable to banks." This provision has been in the Act since it was first passed in 1914 and was not changed by the 1950 amendments. The Bank Merger Act of 1960, assigning roles in merger applications to the FDIC and the Comptroller of the Currency as well as to the FRB, plainly supplanted, we

*Second.* The Congress which debated the bill to amend § 7 was fully aware of the important differences between a merger and a pure purchase of assets. For example, Senator Kilgore remarked:

"When you talk about mergers, you are talking about a stock transaction. . . .

". . . [A]ctually what you do is merge the stock-holdings of both corporations, and instead of that— I am thinking in practical terms—you merge the corporate entities of the two corporations and you get one corporation out of it, and you issue stock in the one corporation in lieu of the stock in the other corporation, whereupon the stock of the corporation which had been merged is canceled by the new corporation, and you have one corporation handling the operation of two. So it really is a stock transaction in the final wind-up, regardless of what you call it. But what I call a purchase of assets is where you purchase physical assets, things upon which you could lay your hand, either in the records or on the ground . . . ." Hearings before a Subcommittee of

---

think, whatever authority the FRB may have acquired under § 11, by virtue of the amendment of § 7, to enforce § 7 against bank mergers. Since the Bank Merger Act applies only to mergers, consolidations, acquisitions of assets, and assumptions of liabilities but not to outright stock acquisitions, the FRB's authority under § 11 as it existed before the 1950 amendment of § 7 remains unaffected. See, *e. g., Transamerica Corp.* v. *Board of Govs. of Fed. Res. Sys.,* 206 F. 2d 163 (C. A. 3d Cir. 1953).

Nothing in this opinion, of course, limits the power of the FTC, under §§ 7 and 11, as amended, to reach any transaction, including mergers and consolidations, in the broad range between and including pure stock and pure assets acquisitions, where the acquiring corporation is subject to the FTC's jurisdiction, see 15 U. S. C. § 45 (a) (6), and to order divestiture of the stock, share capital, or assets acquired in the transaction, see 15 U. S. C. § 21.

the Senate Committee on the Judiciary on Corporate
Mergers and Acquisitions, 81st Cong., 1st and 2d
Sess. 176; to the same effect, see, *e. g., id.,* at 100,
139, 320–325.

Plainly, acquisition of "assets" as used in amended § 7
was not meant to be a simple equivalent of acquisition
by merger, but was intended rather to ensure against the
blunting of the antimerger thrust of the section by evasive
transactions such as had rendered the original section in-
effectual. Thus, the stock-acquisition provision of § 7,
though reenacted *in haec verba* by the 1950 amendment,
must be deemed expanded in its new context to include,
at the very least, acquisitions by merger or consolidation,
transactions which entail a transfer of stock of the parties,
while the assets-acquisition provision clearly reaches cor-
porate acquisitions involving no such transfer. And see
note 22, *supra.* This seems to be the point of Congress-
man Patman's remark, typical of many, that: "What this
bill does is to put all corporate mergers on the same foot-
ing, whether the result of the acquisitions of stock or the
acquisition of physical assets." Hearings, *supra,* at 126.
To the same effect is the House Report on the bill to
amend § 7: "The bill retains language of the present
statute which is broad enough to prevent evasion of the
central purpose. It covers not only purchase of assets
or stock but also any other method of acquisition . . . .
It forbids not only direct acquisitions but also indirect
acquisitions . . . ." H. R. Rep. No. 1191, 81st Cong., 1st
Sess. 8–9.

*Third.* The legislative history shows that the objective
of including the phrase "corporation subject to the juris-
diction of the Federal Trade Commission" in § 7 was not
to limit the amalgamations to be covered by the amended
statute but to make explicit the role of the FTC in admin-
istering the section. The predominant focus of the hear-

ings, debates, and committee reports was upon the powers of the FTC. The decisions of this Court which had uncovered the loophole in the original § 7—*Thatcher, Swift,* and *Arrow-Hart*—had not rested directly upon the substantive coverage of § 7, but rather upon the limited scope of the FTC's divestiture powers under § 11. See note 17, *supra.* There were intimations that the *courts'* power to enforce § 7 might be far greater. See *Thatcher Mfg. Co. v. Federal Trade Comm'n, supra,* at 561; *Swift & Co. v. Federal Trade Comm'n, supra,* at 563; *Federal Trade Comm'n v. Eastman Kodak Co.,* 274 U. S. 619, 624; *Arrow-Hart & Hegeman Elec. Co. v. Federal Trade Comm'n, supra,* at 598–599; Irvine, The Uncertainties of Section 7 of the Clayton Act, 14 Cornell L. Q. 28 (1928). Thus, the loophole was sometimes viewed as primarily a gap in the FTC's jurisdiction.[23] Furthermore, although the Clayton Act has always provided for dual enforcement by court and agency, see 15 U. S. C. § 25; *United States v. W. T. Grant Co.,* 345 U. S. 629; *United States Alkali Export Assn. v. United States,* 325 U. S. 196, 208, prior to the 1950 amendment enforcement of § 7 was left largely to the FTC. Martin, Mergers and the Clayton Act (1959), 205, 219; Montague, The Celler Anti-Merger Act: An Administrative Problem in an Economic Crisis, 37 A. B. A. J. 253

---

[23] See, *e. g.,* statement of Assistant Attorney General Bergson: "If it [§ 7] is to have any significant effect for the future, it is essential that it be amended so that the Federal Trade Commission will be in a position to deal with the merger problem as it exists today." Hearing before Subcommittee No. 3 of the House Committee on the Judiciary on Amending Sections 7 and 11 of the Clayton Act, 81st Cong., 1st Sess., ser. 10, p. 28. See also 96 Cong. Rec. 16437, 16452–16453; 95 Cong. Rec. 11490–11491, 11499, 11504 (Representative Byrne: "the suggested amendment to sections 7 and 11 of the Clayton Act would merely give the [Federal Trade] Commission the same power in regard to asset acquisitions that it already possesses over acquisitions of stock. This would close the loophole and restore meaning to the statute.").

(1951). And the impetus to amend § 7 came in large part from the FTC. See, e. g., Martin, *supra,* 187–194; Federal Trade Commission, Annual Reports, 1928, pp. 18–19; 1940, pp. 12–13; 1948, pp. 11–22; The Merger Movement: A Summary Report (1948). Congress in 1950 clearly intended to remove all question concerning the FTC's remedial power over corporate acquisitions, and therefore explicitly enlarged the FTC's jurisdiction. Congress' choice of this means of underscoring the FTC's role in enforcing § 7 provides no basis for a construction which would undercut the dominant congressional purpose of eliminating the difference in treatment accorded stock acquisitions and mergers by the original § 7 as construed.

*Fourth.* It is settled law that "[i]mmunity from the antitrust laws is not lightly implied." *California* v. *Federal Power Comm'n,* 369 U. S. 482, 485. Cf. *United States* v. *Borden Co.,* 308 U. S. 188, 198–199; *United States* v. *Southern Pac. Co.,* 259 U. S. 214, 239–240. This canon of construction, which reflects the felt indispensable role of antitrust policy in the maintenance of a free economy, is controlling here. For there is no indication in the legislative history to the 1950 amendment of § 7 that Congress wished to confer a special dispensation upon the banking industry; if Congress had so wished, moreover, surely it would have exempted the industry from the stock-acquisition as well as the assets-acquisition provision.

Of course, our construction of the amended § 7 is not foreclosed because, after the passage of the amendment, some members of Congress, and for a time the Justice Department, voiced the view that bank mergers were still beyond the reach of the section.[24] "[T]he views of a sub-

---

[24] See, e. g., Staff of Subcommittee No. 5 of House Committee on the Judiciary, 82d Cong., 2d Sess., Bank Mergers and Concentration of Banking Facilities (1952) vii; H. R. 5948, printed in 102

sequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Price,* 361 U. S. 304, 313; see *Rainwater* v. *United States,* 356 U. S. 590, 593; *United States* v. *United Mine Workers,* 330 U. S. 258, 282; cf. *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 590. This holds true even though misunderstanding of the scope of § 7 may have played some part in the passage of the Bank Merger Act of 1960.[25] There is a question, to which we shall shortly turn, whether there exists such inconsistency between the Bank Merger Act and § 7, as we now construe it, as to require a holding that § 7 must be deemed repealed *pro tanto;* but that is a different question from whether misunderstanding of the scope of § 7 is relevant to our task of defining what scope Congress gave the section in 1950. When Congress enacted the Bank Merger Act, the applicability of § 7 to bank mergers was still to be authoritatively determined; it was a subject of speculation. Thus, this is not a case in which our "earlier decisions are part of the arch on which the new structure rests, [and] we [must] refrain from disturbing them lest we change the design that Congress fashioned." *State Board of Ins.* v. *Todd Shipyards Corp.,* 370 U. S. 451, 458. Cf. note 17, *supra.* The design fashioned in the Bank Merger Act was predicated upon uncertainty as to the scope of § 7, and we do no violence to that design by dispelling the uncertainty.

Cong. Rec. 2108–2109 (1956); Hearings before a Subcommittee of the Senate Committee on Banking and Currency on the Financial Institutions Act of 1957, 85th Cong., 1st Sess., pt. 2, p. 1030 (testimony of Attorney General Brownell); H. R. Rep. No. 1416, Regulation of Bank Mergers, 86th Cong., 2d Sess. 9; S. Rep. No. 196, Regulation of Bank Mergers, 86th Cong., 1st Sess. 1–2, 5.

[25] See, *e. g.,* remarks of Representative Spence: "The Clayton Act is ineffective as to bank mergers because in the case of banks it covers only stock acquisitions and bank mergers are not accomplished that way." 106 Cong. Rec. 7257 (1960). See also note 24, *supra.*

## B. *The Effect of the Bank Merger Act of 1960.*

Appellees contended below that the Bank Merger Act, by directing the banking agencies to consider competitive factors before approving mergers, 12 U. S. C. (1958 ed., Supp. IV) § 1828 (c), note 8, *supra,* immunizes approved mergers from challenge under the federal antitrust laws.[26] We think the District Court was correct in rejecting this contention. No express immunity is conferred by the Act.[27] Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored,[28] and

---

[26] This contention was abandoned on appeal. We consider it, nevertheless, because it touches the proper relations of the judicial and administrative spheres. *United States* v. *Western Pac. R. Co.,* 352 U. S. 59, 63.

[27] Contrast this with the express exemption provisions of, *e. g.,* the Federal Aviation Act, 49 U. S. C. § 1384; Federal Communications Act, 47 U. S. C. §§ 221 (a), 222 (c)(1); Interstate Commerce Act, 49 U. S. C. §§ 5 (11), 5b (9), 22; Shipping Act, 46 U. S. C. (1958 ed. Supp. III) § 814; Webb-Pomerene Act, 15 U. S. C. § 62; and the Clayton Act itself, § 7, 15 U. S. C. § 18.

[28] See *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 314–315; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 343 (plurality opinion), 374–376 (dissenting opinion); *United States* v. *Pacific & Arctic Ry. & Nav. Co.,* 228 U. S. 87, 105, 107; *Keogh* v. *Chicago & N. W. R. Co.,* 260 U. S. 156, 161–162; *Central Transfer Co.* v. *Terminal Railroad Assn.,* 288 U. S. 469, 474–475; *Terminal Warehouse Co.* v. *Pennsylvania R. Co.,* 297 U. S. 500, 513–515; *United States* v. *Borden Co.,* 308 U. S. 188, 197–206; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 226–228; *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 456–457; *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196, 205–206; *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797, 809–810; *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1; *United States* v. *Radio Corp. of America,* 358 U. S. 334; *Maryland & Va. Milk Producers Assn.* v. *United States,* 362 U. S. 458, 464–467; *California* v. *Federal Power Comm'n,* 369 U. S. 482; *Pan American World Airways* v. *United States,* 371 U. S. 296, 304, 305; *Silver* v. *New York Stock Exchange,* 373 U. S. 341.

have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.[29] Two recent cases, *Pan American World Airways* v. *United States,* 371 U. S. 296, and *California* v. *Federal Power Comm'n,* 369 U. S. 482, illustrate this principle. In *Pan American,* the Court held that because the Civil Aeronautics Board had been given broad powers to enforce the competitive standard clearly delineated by the Civil Aeronautics Act, and to immunize a variety of transactions from the operation of the antitrust laws, the Sherman Act could not be applied to facts composing the precise ingredients of a case subject to the Board's broad regulatory and remedial powers; in contrast, the banking agencies have authority neither to enforce the antitrust laws against mergers, cf. note 22, *supra,* nor to grant immunity from those laws.

In the *California* case, on the other hand, the Court held that the FPC's approval of a merger did not confer immunity from § 7 of the Clayton Act, even though, as in the instant case, the agency had taken the competitive factor into account in passing upon the merger application. See 369 U. S., at 484–485, 487–488. We think *California* is controlling here. Although the Comptroller was required to consider effect upon competition in passing upon appellees' merger application, he was not required to give this factor any particular weight; he was not even required to (and did not) hold a hearing before approving the application; and there is no specific provision for judicial review of his decision.[30] Plainly, the

---

[29] See, *e. g., Keogh* v. *Chicago & N. W. R. Co., supra,* at 163; *Pan American World Airways* v. *United States, supra,* at 309–310. Cf. *Texas & Pac. R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426.

[30] With respect to the question (upon which we intimate no view) whether judicial review of the Comptroller's decision is possible notwithstanding the absence of a specific provision, see Note, 75 Harv. L. Rev. 756, 762–763 (1962); Note, 37 N. Y. U. L. Rev. 735, 750, n. 95 (1962); cf. 1 Davis, Administrative Law (1958), § 4.04.

range and scope of administrative powers under the Bank Merger Act bear little resemblance to those involved in *Pan American.*

Nor did Congress, in passing the Bank Merger Act, embrace the view that federal regulation of banking is so comprehensive that enforcement of the antitrust laws would be either unnecessary, in light of the completeness of the regulatory structure, or disruptive of that structure. On the contrary, the legislative history of the Act seems clearly to refute any suggestion that applicability of the antitrust laws was to be affected. Both the House and Senate Committee Reports stated that the Act would not affect in any way the applicability of the antitrust laws to bank acquisitions. H. R. Rep. No. 1416, 86th Cong., 2d Sess. 9; S. Rep. No. 196, 86th Cong., 1st Sess. 3. See also, *e. g.,* 105 Cong. Rec. 8131 (remarks of Senator Robertson, the Act's sponsor). Moreover, bank regulation is in most respects less complete than public utility regulation, to which interstate rail and air carriers, among others, are subject. Rate regulation in the banking industry is limited and largely indirect, see p. 328, *supra;* banks are under no duty not to discriminate in their services; and though the location of bank offices is regulated, banks may do business—place loans and solicit deposits—where they please. The fact that the banking agencies maintain a close surveillance of the industry with a view toward preventing unsound practices that might impair liquidity or lead to insolvency does not make federal banking regulation all-pervasive, although it does minimize the hazards of intense competition. Indeed, that there are so many direct public controls over unsound competitive practices in the industry refutes the argument that private controls of competition are necessary in the public interest and ought therefore to be immune from scrutiny under the antitrust laws. Cf. Kaysen and Turner, Antitrust Policy (1959), 206.

We note, finally, that the doctrine of "primary jurisdiction" is not applicable here. That doctrine requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme. See *Far East Conference* v. *United States,* 342 U. S. 570; *Great Northern R. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285; Schwartz, Legal Restriction of Competition in the Regulated Industries: An Abdication of Judicial Responsibility, 67 Harv. L. Rev. 436, 464 (1954).[31] Court jurisdiction is not thereby ousted, but only postponed. See *General Am. Tank Car Corp.* v. *El Dorado Terminal Co.,* 308 U. S. 422, 433; *Federal Maritime Bd.* v. *Isbrandtsen Co.,* 356 U. S. 481, 498–499; 3 Davis, Administrative Law (1958), 1–55. Thus, even if we were to assume the applicability of the doctrine to merger-application proceedings before the banking agencies,[32] the present action would not be barred, for the agency proceeding was completed before the antitrust action was commenced. Cf. *United States* v. *Western Pac. R. Co.,* 352 U. S. 59, 69; *Retail Clerks Int'l Assn.* v. *Schermerhorn,* 373 U. S. 746, 756. We recognize that the practical effect of applying the doctrine of pri-

---

[31] See generally Jaffe, Primary Jurisdiction Reconsidered. The Anti-Trust Laws, 102 U. of Pa. L. Rev. 577 (1954); Latta, Primary Jurisdiction in the Regulated Industries and the Antitrust Laws, 30 U. of Cin. L. Rev. 261 (1961).; Note, Regulated Industries and the Antitrust Laws: Substantive and Procedural Coordination, 58 Col. L. Rev. 673 (1958).

[32] In *California* v. *Federal Power Comm'n, supra,* the Court held that the FPC must stay its proceeding on a merger application until the completion of a pending antitrust suit by the Justice Department; *a fortiori,* the court entertaining the suit would not be required to abstain pending consideration of the merger application by the FPC. We need not and do not consider the question whether the *California* decision would control here had the Comptroller been denied an opportunity to approve the merger before the antitrust suit was commenced.

mary jurisdiction has sometimes been to channel judicial enforcement of antitrust policy into appellate review of the agency's decision, see *Federal Maritime Bd.* v. *Isbrandtsen Co., supra;* cf. *D. L. Piazza Co.* v. *West Coast Line, Inc.,* 210 F. 2d 947 (C. A. 2d Cir. 1954), or even to preclude such enforcement entirely if the agency has the power to approve the challenged activities, see *United States Nav. Co.* v. *Cunard S. S. Co.,* 284 U. S. 474; cf. *United States* v. *Railway Express Agency,* 101 F. Supp. 1008 (D. C. D. Del. 1951); but see *Federal Maritime Bd.* v. *Isbrandtsen Co., supra.* But here there may be no power of judicial review of the administrative decision approving the merger, and such approval does not in any event confer immunity from the antitrust laws, see pp. 350–352, *supra.* Furthermore, the considerations that militate against finding a repeal of the antitrust laws by implication from the existence of a regulatory scheme also argue persuasively against attenuating, by postponing, the courts' jurisdiction to enforce those laws.

It should be unnecessary to add that in holding as we do that the Bank Merger Act of 1960 does not preclude application of § 7 of the Clayton Act to bank mergers, we deprive the later statute of none of its intended force. Congress plainly did not intend the 1960 Act to extinguish other sources of federal restraint of bank acquisitions having anticompetitive effects. For example, Congress certainly knew that bank mergers would continue subject to the Sherman Act, see p. 352, *supra,* as well as that pure stock acquisitions by banks would continue subject to § 7 of the Clayton Act. If, in addition, bank mergers are subject to § 7, we do not see how the objectives of the 1960 Act are thereby thwarted. It is not as if the Clayton and Sherman Acts embodied approaches to antitrust policy inconsistent with or unrelated to each other. The Sherman Act, of course, forbids mergers effecting an unreasonable restraint of trade. See, *e. g., Northern*

*Securities Co. v. United States,* 193 U. S. 197; *United States* v. *Union Pac. R. Co.,* 226 U. S. 61; indeed, there is presently pending before this Court a challenge to a bank merger predicated solely on the Sherman Act. *United States* v. *First Nat. Bank & Trust Co. of Lexington,* prob. juris. noted, *post,* p. 824. And the tests of illegality under the Sherman and Clayton Acts are complementary. "[T]he public policy announced by § 7 of the Clayton Act is to be taken into consideration in determining whether acquisition of assets . . . violates the prohibitions of the Sherman Act against unreasonable restraints." *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 507, n. 7; see Note, 52 Col. L. Rev. 766, 768, n. 10 (1952). To be sure, not every violation of § 7, as amended, would necessarily be a violation of the Sherman Act; our point is simply that since Congress passed the 1960 Act with no intention of displacing the enforcement of the Sherman Act against bank mergers—or even of § 7 against pure stock acquisitions by banks—continued application of § 7 to bank mergers cannot be repugnant to the design of the 1960 Act. It would be anomalous to conclude that Congress, while intending the Sherman Act to remain fully applicable to bank mergers, and § 7 of the Clayton Act to remain fully applicable to pure stock acquisitions by banks, nevertheless intended § 7 to be completely inapplicable to bank mergers.

### III. THE LAWFULNESS OF THE PROPOSED MERGER UNDER SECTION 7.

The statutory test is whether the effect of the merger "may be substantially to lessen competition" "in any line of commerce in any section of the country." We analyzed the test in detail in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, and that analysis need not be repeated or extended here, for the instant case presents only a straightforward problem of application to particular facts.

We have no difficulty in determining the "line of commerce" (relevant product or services market) and "section of the country" (relevant geographical market) in which to appraise the probable competitive effects of appellees' proposed merger. We agree with the District Court that the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term "commercial banking," see note 5, *supra,* composes a distinct line of commerce. Some commercial banking products or services are so distinctive that they are entirely free of effective competition from products or services of other financial institutions; the checking account is in this category. Others enjoy such cost advantages as to be insulated within a broad range from substitutes furnished by other institutions. For example, commercial banks compete with small-loan companies in the personal-loan market; but the small-loan companies' rates are invariably much higher than the banks', in part, it seems, because the companies' working capital consists in substantial part of bank loans.[33] Finally, there are banking facilities which,

---

[33] Cf. *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 425 (C. A. 2d Cir. 1945). In the instant case, unlike *Aluminum Co.,* there is virtually no time lag between the banks' furnishing competing financial institutions (small-loan companies, for example) with the raw material, *i. e.,* money, and the institutions' selling the finished product, *i. e.,* loans; hence the instant case, compared with *Aluminum Co.* in this respect, is *a fortiori.* As one banker testified quite frankly in the instant case in response to the question: "Do you feel that you are in substantial competition with these institutions [personal-finance and sales-finance companies] that you lend . . . such money to for loans that you want to make?"—"Oh, no, we definitely do not. If we did, we would stop making the loans to them." (R. 298.) The reason for the competitive disadvantage of most lending institutions *vis-à-vis* banks is that only banks obtain the bulk of their working capital without having to pay interest or comparable charges thereon, by virtue of their unique power to accept demand deposits. The critical

although in terms of cost and price they are freely competitive with the facilities provided by other financial institutions, nevertheless enjoy a settled consumer preference, insulating them, to a marked degree, from competition; this seems to be the case with savings deposits.[34] In sum, it is clear that commercial banking is a market "sufficiently inclusive to be meaningful in terms of trade realities." *Crown Zellerbach Corp.* v. *Federal Trade Comm'n,* 296 F. 2d 800, 811 (C. A. 9th Cir. 1961).

We part company with the District Court on the determination of the appropriate "section of the country." The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. See Bock, Mergers and Markets (1960), 42. This depends upon "the geographic structure of supplier-customer relations." Kaysen and Turner, Anti-

---

area of short-term commercial credit, see pp. 326–327, *supra,* appears to be one in which banks have little effective competition, save in the case of very large companies which can meet their financing needs from retained earnings or from issuing securities or paper.

[34] As one witness for the defendants testified:

"We have had in Philadelphia for 50 years or more the mutual savings banks offering $\frac{1}{2}$ per cent and in some instances more than $\frac{1}{2}$ per cent higher interest than the commercial banks. Nevertheless, the rate of increase in savings accounts in commercial banks has kept pace with and in many of the banks exceeded the rate of increase of the mutual banks paying $3\frac{1}{2}$ per cent. . . .

"I have made some inquiries. There are four banks on the corner of Broad and Chestnut. Three of them are commercial banks all offering 3 per cent, and one is a mutual savings bank offering $3\frac{1}{2}$. As far as I have been able to discover, there isn't anybody in Philadelphia who will take the trouble to walk across Broad Street to get $\frac{1}{2}$ of 1 per cent more interest. If you ask me why, I will say I do not know. Habit, custom, personal relationships, convenience, doing all your banking under one roof appear to be factors superior to changes in the interest rate level." (R. 1388–1389.)

trust Policy (1959), 102. In banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance.[35] See *Transamerica Corp. v. Board of Govs. of Fed. Res. Sys.*, 206 F. 2d 163, 169 (C. A. 3d Cir. 1953). The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries. See, *e. g., American*

---

[35] Consider the following colloquy between governmental counsel and a witness for the defendants:

"Q. What do you consider to be the area of a branch office?

"A. Well, there is no set rule on that. We hope to have an area from 1½ to 2 miles.

"However, we have opened branches directly in the communities where other banks are established, in fact, across the street from them because it is not only a question of getting new business, it's a question of servicing and retaining the accounts that we now have.

.    .    .    .    .

"Q. And your business is not necessarily dependent upon it [the customer] being within a mile or two of a branch, is it?'

"A. To a large degree, it is, because we found that we were losing deposit accounts regularly from our in-town offices because other banks were opening or had offices in other sections of the city; and in order to retain those accounts and to get additional business we felt it was necessary to establish branches." (R. 1815.)

As far as the customer for a bank loan is concerned, "the size of his market is somewhat dependent upon his own size, how well he is known, and so on. For example, for small business concerns known primarily locally, they may consider that their market is a strictly local one, and they may be forced by circumstances to do business with banks in a nearby geographic relationship to them. On the other hand, as businesses increase in size, the scope of their business activities, their national reputation, the alternatives they have available to them will be spread again over a very large area, possibly as large as the entire United States." (R. 1372.) (Defendants' testimony on direct examination.)

*Crystal Sugar Co.* v. *Cuban-American Sugar Co.*, 152 F. Supp. 387, 398 (D. C. S. D. N. Y. 1957), aff'd, 259 F. 2d 524 (C. A. 2d Cir. 1958). Therefore, since, as we recently said in a related context, the "area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies," Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U. S. 320, 327 (emphasis supplied); see *Standard Oil Co.* v. *United States,* 337 U. S. 293, 299 and 300, n. 5, the four-county area in which appellees' offices are located would seem to be the relevant geographical market. Cf. *Brown Shoe Co., supra,* at 338–339. In fact, the vast bulk of appellees' business originates in the four-county area.[36] Theoretically, we should be concerned with the possibility that bank offices on the perimeter of the area may be in

[36] The figures for PNB and Girard respectively are: 54% and 63% of the dollar volume of their commercial and industrial loans originate in the four-county area; 75% and 70%, personal loans; 74% and 84%, real estate loans; 41% and 62%, lines of credit; 94% and 72%, personal trusts; 81% and 94%, time and savings deposits; 56% and 77%, demand deposits; 93% and 87%, demand deposits of individuals. Actually, these figures may be too low. The evidence discloses that most of the business done outside the area is with large borrowers and large depositors; appellees do not, by and large, deal with small businessmen and average individuals not located in the four-county area. For example, of appellees' combined total business demand deposits under $10,000, 94% originate in the four-county area. This reinforces the thesis that the smaller the customer, the smaller is his banking market geographically. See note 35, *supra.*

The appellees concede that the four-county area has sufficient commercial importance to qualify, under *Brown Shoe Co., supra,* at 336–337, as a "section of the country" within the meaning of § 7. See *Maryland & Va. Milk Producers Assn.* v. *United States,* 362 U. S. 458, 469; cf. *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 226; *Indiana Farmer's Guide Publishing Co.* v. *Prairie Farmer Publishing Co.,* 293 U. S. 268, 279.

effective competition with bank offices within; actually, this seems to be a factor of little significance.[37]

We recognize that the area in which appellees have their offices does not delineate with perfect accuracy an appropriate "section of the country" in which to appraise the effect of the merger upon competition. Large borrowers and large depositors, the record shows, may find it practical to do a large part of their banking business outside their home community; very small borrowers and depositors may, as a practical matter, be confined to bank offices in their immediate neighborhood; and customers

---

[37] Appellees suggest not that bank offices skirting the four-county area provide meaningful alternatives to bank customers within the area, but that such alternatives are provided by large banks, from New York and elsewhere, which solicit business in the Philadelphia area. There is no evidence of the amount of business done in the area by banks with offices outside the area; it may be that such figures are unobtainable. In any event, it would seem from the local orientation of banking insofar as smaller customers are concerned, see notes 35 and 36, *supra*, that competition from outside the area would only be important to the larger borrowers and depositors. If so, the four-county area remains a valid geographical market in which to assess the anticompetitive effect of the proposed merger upon the banking facilities available to the smaller customer—a perfectly good "line of commerce," in light of Congress' evident concern, in enacting the 1950 amendments to § 7, with preserving small business. See *Brown Shoe Co., supra,* at 315–316. As a practical matter the small businessman can only satisfy his credit needs at local banks. To be sure, there is still some artificiality in deeming the four-county area the relevant "section of the country" so far as businessmen located near the perimeter are concerned. But such fuzziness would seem inherent in any attempt to delineate the relevant geographical market. Note, 52 Col. L. Rev. 766, 778–779, n. 77 (1952). And it is notable that outside the four-county area, appellees' business rapidly thins out. Thus, the other six counties of the Delaware Valley account for only 2% of appellees' combined individual demand deposits; 4%, demand deposits of partnerships and corporations; 7%, loans; 2%, savings deposits; 4%, business time deposits.

of intermediate size, it would appear, deal with banks within an area intermediate between these extremes. See notes 35–37, *supra*. So also, some banking services are evidently more local in nature than others. But that in banking the relevant geographical market is a function of each separate customer's economic scale means simply that a workable compromise must be found: some fair intermediate delineation which avoids the indefensible extremes of drawing the market either so expansively as to make the effect of the merger upon competition seem insignificant, because only the very largest bank customers are taken into account in defining the market, or so narrowly as to place appellees in different markets, because only the smallest customers are considered. We think that the four-county Philadelphia metropolitan area, which state law apparently recognizes as a meaningful banking community in allowing Philadelphia banks to branch within it, and which would seem roughly to delineate the area in which bank customers that are neither very large nor very small find it practical to do their banking business, is a more appropriate "section of the country" in which to appraise the instant merger than any larger or smaller or different area. Cf. Hale and Hale, Market Power: Size and Shape Under the Sherman Act (1958), 119. We are helped to this conclusion by the fact that the three federal banking agencies regard the area in which banks have their offices as an "area of effective competition." Not only did the FDIC and FRB, in the reports they submitted to the Comptroller of the Currency in connection with appellees' application for permission to merge, so hold, but the Comptroller, in his statement approving the merger, agreed: "With respect to the effect upon competition, there are three separate levels and effective areas of competition involved. These are the national level for na-

tional·accounts, the regional or sectional area, and the local area of the City of Philadelphia and the immediately surrounding area."

Having determined the relevant market, we come to the ultimate question under § 7: whether the effect of the merger "may be substantially to lessen competition" in the relevant market. Clearly, this is not the kind of question which is susceptible of a ready and precise answer in most cases. It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their "incipiency." See *Brown Shoe Co., supra,* at 317, 322. Such a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market; yet the relevant economic data are both complex and elusive. See generally Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226 (1960). And unless businessmen can assess the legal consequences of a merger with some confidence, sound business planning is retarded. See *Crown Zellerbach Corp.* v. *Federal Trade Comm'n,* 296 F. 2d 800, 826–827 (C. A. 9th Cir. 1961). So also, we must be alert to the danger of subverting congressional intent by permitting a too-broad economic investigation. *Standard Oil Co.* v. *United States,* 337 U. S. 293, 313. And so in any case in which it is possible, without doing violence to the congressional objective embodied in § 7, to simplify the test of illegality, the courts ought to do so in the interest of sound and practical judicial administration. See *Union Carbide Corp.,* Trade Reg. Rep., FTC Complaints and Orders, 1961–1963, ¶ 15503, at 20375–20376 (concurring opinion). This is such a case.

We noted in *Brown Shoe Co., supra,* at 315, that "[t]he dominant theme pervading congressional consideration of

the 1950 amendments [to § 7] was a fear of what was considered to be a rising tide of economic concentration in the American economy." This intense congressional concern with the trend toward concentration warrants, dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. See *United States* v. *Koppers Co.*, 202 F. Supp. 437 (D. C. W. D. Pa. 1962).

Such a test lightens the burden of proving illegality only with respect to mergers whose size makes them inherently suspect in light of Congress' design in § 7 to prevent undue concentration. Furthermore, the test is fully consonant with economic theory.[38] That "[c]ompetition is likely to be greatest when there are many sellers, none of which has any significant market share," [39] is common ground among most economists, and was undoubtedly a premise of congressional reasoning about the antimerger statute.

---

[38] See Kaysen and Turner, Antitrust Policy (1959), 133; Stigler, Mergers and Preventive Antitrust Policy, 104 U. of Pa. L. Rev. 176, 182 (1955); Bok, *supra*, at 308–316, 328. Cf. Markham, Merger Policy Under the New Section 7: A Six-Year Appraisal, 43 Va. L. Rev. 489, 521–522 (1957).

[39] Comment, "Substantially to Lessen Competition . . .": Current Problems of Horizontal Mergers, 68 Yale L. J. 1627, 1638–1639 (1959); see, *e. g.*, Machlup, The Economics of Sellers' Competition (1952), 84–93, 333–336; Bain, Barriers to New Competition (1956), 27. Cf. Mason, Market Power and Business Conduct: Some Comments, 46–2 Am. Econ. Rev. (1956), 471.

The merger of appellees will result in a single bank's controlling at least 30% of the commercial banking business in the four-county Philadelphia metropolitan area.[40] Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.[41]

---

[40] See p. 331, *supra*. We note three factors that cause us to shade the percentages given earlier in this opinion, in seeking to calculate market share. (1) The percentages took no account of banks which do business in the four-county area but have no offices there; however, this seems to be a factor of little importance, at least insofar as smaller customers are concerned, see note 37, *supra*. (2) The percentages took no account of banks which have offices in the four-county area but not their home offices there; however, there seem to be only two such offices and appellees in this Court make no reference to this omission. (3) There are no percentages for the amount of business of banks located in the area, other than appellees, which originates in the area. Appellees contend that since most of the 40 other banks are smaller, they do a more concentratedly local business than appellees, and hence account for a relatively larger proportion of such business. If so, we doubt much correction is needed. The five largest banks in the four-county area at present control some 78% of the area banks' assets. Thus, even if the small banks have a somewhat different pattern of business, it is difficult to see how that would substantially diminish the appellees' share of the local banking business.

No evidence was introduced as to the quantitative significance of these three factors, and appellees do not contend that as a practical matter such evidence could have been obtained. Under the circumstances, we think a downward correction of the percentages to 30% produces a conservative estimate of appellees' market share.

[41] Kaysen and Turner, *supra*, note 38, suggest that 20% should be the line of prima facie unlawfulness; Stigler suggests that any acquisition by a firm controlling 20% of the market after the merger is presumptively unlawful; Markham mentions 25%. Bok's principal test is increase in market concentration, and he suggests a figure of 7% or 8%. And consult note 20, *supra*. We intimate no view on the validity of such tests for we have no need to consider percentages smaller than those in the case at bar, but we note that such tests are more rigorous than is required to dispose of the instant case. Need-

Further, whereas presently the two largest banks in the area (First Pennsylvania and PNB) control between them approximately 44% of the area's commercial banking business, the two largest after the merger (PNB-Girard and First Pennsylvania) will control 59%. Plainly, we think, this increase of more than 33% in concentration must be regarded as significant.[42]

Our conclusion that these percentages raise an inference that the effect of the contemplated merger of appellees may be substantially to lessen competition is not an arbitrary one, although neither the terms of § 7 nor the legislative history suggests that any particular percentage share was deemed critical. The House Report states that the tests of illegality under amended § 7 "are intended to be similar to those which the courts have applied in interpreting the same language as used in other sections of the Clayton Act." H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8. Accordingly, we have relied upon decisions under these other sections in applying § 7. See *Brown Shoe Co.,* *supra, passim;* cf. *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 595, and n. 15. In *Standard Oil Co.* v. *United States,* 337 U. S. 293, cited in S. Rep. No. 1775, 81st Cong., 2d Sess. 6, this Court held violative of § 3 of the Clayton Act exclusive contracts

---

less to say, the fact that a merger results in a less-than-30% market share, or in a less substantial increase in concentration than in the instant case, does not raise an inference that the merger is *not* violative of § 7. See, *e. g., Brown Shoe Co., supra.*

[42] See note 41, *supra.* It is no answer that, among the three presently largest firms (First Pennsylvania, PNB, and Girard), there will be no increase in concentration. If this argument were valid, then once a market had become unduly concentrated, further concentration would be legally privileged. On the contrary, if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great. Comment, note 39, *supra,* at 1644.

whereby the defendant company, which accounted for 23% of the sales in the relevant market and, together with six other firms, accounted for 65% of such sales, maintained control over outlets through which approximately 7% of the sales were made. In *Federal Trade Comm'n v. Motion Picture Adv. Serv. Co.*, 344 U. S. 392, we held unlawful, under § 1 of the Sherman Act and § 5 of the Federal Trade Commission Act, rather than under § 3 of the Clayton Act, exclusive arrangements whereby the four major firms in the industry had foreclosed 75% of the relevant market; the respondent's market share, evidently, was 20%. Kessler and Stern, Competition, Contract, and Vertical Integration, 69 Yale L. J. 1, 53 n. 231 (1959). In the instant case, by way of comparison, the four largest banks after the merger will foreclose 78% of the relevant market. P. 331, *supra*. And in *Standard Fashion Co. v. Magrane-Houston Co.*, 258 U. S. 346, the Court held violative of § 3 a series of exclusive contracts whereby a single manufacturer controlled 40% of the industry's retail outlets. Doubtless these cases turned to some extent upon whether "by the nature of the market there is room for newcomers." *Federal Trade Comm'n v. Motion Picture Adv. Serv. Co., supra,* at 395. But they remain highly suggestive in the present context, for as we noted in *Brown Shoe Co., supra,* at 332, n. 55, integration by merger is more suspect than integration by contract, because of the greater permanence of the former. The market share and market concentration figures in the contract-integration cases, taken together with scholarly opinion, see notes 41 and 42, *supra,* support, we believe, the inference we draw in the instant case from the figures disclosed by the record.

There is nothing in the record of this case to rebut the inherently anticompetitive tendency manifested by these percentages. There was, to be sure, testimony by bank officers to the effect that competition among banks in

Philadelphia was vigorous and would continue to be vigorous after the merger. We think, however, that the District Court's reliance on such evidence was misplaced. This lay evidence on so complex an economic-legal problem as the substantiality of the effect of this merger upon competition was entitled to little weight, in view of the witnesses' failure to give concrete reasons for their conclusions.[43]

Of equally little value, we think, are the assurances offered by appellees' witnesses that customers dissatisfied with the services of the resulting bank may readily turn to the 40 other banks in the Philadelphia area. In every case short of outright monopoly, the disgruntled customer has alternatives; even in tightly oligopolistic markets, there may be small firms operating. A fundamental purpose of amending § 7 was to arrest the trend toward concentration, the *tendency* to monopoly, before the consumer's alternatives disappeared through merger, and that purpose would be ill-served if the law stayed its hand until 10, or 20, or 30 more Philadelphia banks were absorbed. This is not a fanciful eventuality, in view of the strong trend toward mergers evident in the area, see p. 331, *supra;* and we might note also that entry of new competitors into the banking field is far from easy.[44]

---

[43] The fact that some of the bank officers who testified represented small banks in competition with appellees does not substantially enhance the probative value of their testimony. The test of a competitive market is not only whether small competitors flourish but also whether consumers are well served. See *United States* v. *Bethlehem Steel Corp.,* 168 F. Supp. 576, 588, 592 (D. C. S. D. N. Y. 1958). "[C]ongressional concern [was] with the protection of *competition,* not *competitors." Brown Shoe Co., supra,* at 320. In an oligopolistic market, small companies may be perfectly content to follow the high prices set by the dominant firms, yet the market may be profoundly anticompetitive.

[44] Entry is, of course, wholly a matter of governmental grace. See p. 328, *supra.* In the 10-year period ending in 1961, only one

.So also, we reject the position that commercial banking, because it is subject to a high degree of governmental regulation, or because it deals in the intangibles of credit and services rather than in the manufacture or sale of tangible commodities, is somehow immune from the anticompetitive effects of undue concentration. Competition among banks exists at every level—price, variety of credit arrangements, convenience of location, attractiveness of physical surroundings, credit information, investment advice, service charges, personal accommodations, advertising, miscellaneous special and extra services—and it is keen; on this appellees' own witnesses were emphatic.[45]

---

new bank opened in the Philadelphia four-county area. That was in 1951. At the end of 10 years, the new bank controlled only one-third of 1% of the area's deposits. ·

[45] The following colloquy is representative:

"Q. Mr. Jennings, what is the nature of competition among commercial banks?

"A. Keen, highly competitive. .I think, from my own observation, that I have never known competition among banks to be keener than it is today. . . .

"Q. In what area does competition exist? . . .

"A. I think the stiffest, sternest competition of all is in the field to obtain demand deposits and loans. . . .

"Q. What form does the competition take?

"A. It takes many forms. If we are dealing with the deposits of large corporations, wealthy individuals, I would say that most, if not all, of the major banks of the country are competing for such deposits. The same would hold true as regards loans to those corporations or wealthy individuals.

"If we go into the field of smaller loans, smaller deposits, the competition is more regional—wide but nevertheless regional—and there the large banks as well as the small banks are after that business with everything they have.

"Q. What form does the competition take? Is it competition in price?

"A. No, I wouldn't say that it is competition as to price. After all, interest rates are regulated at the top level by the laws of the

There is no reason to think that concentration is less inimical to the free play of competition in banking than in other service industries. On the contrary, it is in all probability more inimical. For example, banks compete to fill the credit needs of businessmen. Small businessmen especially are, as a practical matter, confined to their locality for the satisfaction of their credit needs. See note 35, *supra*. If the number of banks in the locality is reduced, the vigor of competition for filling the marginal small business borrower's needs is likely to diminish.

---

50 states. Interest rates at the bottom level have no legal limitation, but for practical purposes the prime rate . . . furnishes a very effective floor. I would say that the area of competition for interest rates would range between, let us say, the prime rate of 4½ and 6 per cent for normal loans exclusive of consumer loans, where higher rates are permitted.

.           .           .           .           .

"In the area of service charges, I would say that banks are competitive in that field. They base their service charges primarily on their costs, but they have to maintain a weather eye to windward as to what the competitors are charging in the service charge field. The minute they get out of line in connection with service charges they find their customers will start to protest, and if something isn't done some of the customers will leave them for a differential in service charges of any significance.

"I do not believe that competition is really affected by the price area. I think it is affected largely by the quality and the caliber of service that banks give and whether or not they feel they are being received in the right way, whether they are welcome in the bank. Personalities enter into it very heavily, but I do not think price as such is a major factor in banking competition. It is there, it is a factor, but not major." (R. 1940–1942.)

It should be noted that besides competition in interest rates, there is a great deal of indirect price competition in the banking industry. For example, the amount of compensating balance a bank requires of a borrower (*i. e.*, the amount the borrower must always retain in his demand deposit account with the bank) affects the real cost of the loan, and varies considerably in the bank's discretion.

At the same time, his concomitantly greater difficulty in obtaining credit is likely to put him at a disadvantage *vis-à-vis* larger businesses with which he competes. In this fashion, concentration in banking accelerates concentration generally.

We turn now to three affirmative justifications which appellees offer for the proposed merger. The first is that only through mergers can banks follow their customers to the suburbs and retain their business. This justification does not seem particularly related to the instant merger, but in any event it has no merit. There is an alternative to the merger route: the opening of new branches in the areas to which the customers have moved—so-called *de novo* branching. Appellees do not contend that they are unable to expand thus, by opening new offices rather than acquiring existing ones, and surely one premise of an antimerger statute such as § 7 is that corporate growth by internal expansion is socially preferable to growth by acquisition.

Second, it is suggested that the increased lending limit of the resulting bank will enable it to compete with the large out-of-state banks, particularly the New York banks, for very large loans. We reject this application of the concept of "countervailing power." Cf. *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons,* 340 U. S. 211. If anticompetitive effects in one market could be justified by pro-competitive consequences in another, the logical upshot would be that every firm in an industry could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader. For if all the commercial banks in the Philadelphia area merged into one, it would be smaller than the largest bank in New York City. This is not a case, plainly, where two small firms in a market propose to merge in order to be able to compete more successfully with the leading firms in that

market. Nor is it a case in which lack of adequate banking facilities is causing hardships to individuals or businesses in the community. The present two largest banks in Philadelphia have lending limits of $8,000,000 each. The only businesses located in the Philadelphia area which find such limits inadequate are large enough readily to obtain bank credit in other cities.

This brings us to appellees' final contention, that Philadelphia needs a bank larger than it now has in order to bring business to the area and stimulate its economic development. See p. 334 and note 10, *supra*. We are clear, however, that a merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress when it enacted the amended § 7. Congress determined to preserve our traditionally competitive economy. It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid.

In holding as we do that the merger of appellees would violate § 7 and must therefore be enjoined, we reject appellees' pervasive suggestion that application of the procompetitive policy of § 7 to the banking industry will have dire, although unspecified, consequences for the national economy. Concededly, PNB and Girard are healthy and strong; they are not undercapitalized or overloaned; they have no management problems; the Philadelphia area is not overbanked; ruinous competition is not in the offing. Section 7 does not mandate cutthroat competition in the banking industry, and does not exclude defenses based on dangers to liquidity or

solvency, if to avert them a merger is necessary.[46] It does require, however, that the forces of competition be allowed to operate within the broad framework of governmental regulation of the industry. The fact that banking is a highly regulated industry critical to the Nation's welfare makes the play of competition not less important but more so. At the price of some repetition, we note that if the businessman is denied credit because his banking alternatives have been eliminated by mergers, the whole edifice of an entrepreneurial system is threatened; if the costs of banking services and credit are allowed to become excessive by the absence of competitive pressures, virtually all costs, in our credit economy, will be affected; and unless competition is allowed to fulfill its role as an economic regulator in the banking industry, the result may well be even more governmental regulation. Subject to narrow qualifications, it is surely the case that competition is our fundamental national economic policy, offering as it does the only alternative to the cartelization or governmental regimentation of large portions of the economy. Cf. *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 4. There is no warrant for declining to enforce it in the instant case.

The judgment of the District Court is reversed and the case remanded with direction to enter judgment enjoining the proposed merger. *It is so ordered.*

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

---

[46] Thus, arguably, the so-called failing-company defense, see *International Shoe Co.* v. *Federal Trade Comm'n,* 280 U. S. 291, 299–303, might have somewhat larger contours as applied to bank mergers because of the greater public impact of a bank failure compared with ordinary business failures. But the question what defenses in § 7 actions must be allowed in order to avert unsound banking conditions is not before us, and we intimate no view upon it.

Mr. Justice Harlan, whom Mr. Justice Stewart joins, dissenting.

I suspect that no one will be more surprised than the Government to find that the Clayton Act has carried the day for its case in this Court.

In response to an apparently accelerating trend toward concentration in the commercial banking system in this country, a trend which existing laws were evidently ill-suited to control, numerous bills were introduced in Congress from 1955 to 1960.[1] During this period, the Department of Justice and the federal banking agencies [2] advocated divergent methods of dealing with the competitive aspects of bank mergers, the former urging the extension of § 7 of the Clayton Act to cover such mergers and the latter supporting a regulatory scheme under which the effect of a bank merger on competition would be only one of the factors to be considered in determining whether the merger would be in the public interest. The Justice Department's proposals were repeatedly rejected by Congress, and the regulatory approach of the banking agencies was adopted in the Bank Merger Act of 1960. See infra, pp. 379–383.

Sweeping aside the "design fashioned in the Bank Merger Act" as "predicated upon uncertainty as to the scope of § 7" of the Clayton Act (ante, p. 349), the Court today holds § 7 to be applicable to bank mergers and concludes that it has been violated in this case. I respectfully submit that this holding, which sanctions a remedy

---

[1] See Wemple and Cutler, The Federal Bank Merger Law and the Antitrust Laws, 16 Bus. Law. 994, 995 (1961). Many of the bills are summarized in Funk, Antitrust Legislation Affecting Bank Mergers, 75 Banking L. J. 369 (1958).

[2] These agencies and the areas of their primary supervisory responsibility are: (1) the Comptroller of the Currency—national banks; (2) the Federal Reserve System—state Reserve-member banks; (3) the FDIC—insured nonmember banks.

regarded by Congress as inimical to the best interests of the banking industry and the public, and which will in large measure serve to frustrate the objectives of the Bank Merger Act, finds no justification in either the terms of the 1950 amendment of the Clayton Act or the history of the statute.

## I.

The key to this case is found in the special position occupied by commercial banking in the economy of this country. With respect to both the nature of the operations performed and the degree of governmental supervision, involved, it is fundamentally different from ordinary manufacturing and mercantile businesses.

The unique powers of commercial banks to accept demand deposits, provide checking account services, and lend against fractional reserves permit the banking system as a whole to create a supply of "money," a function which is indispensable to the maintenance of the structure of our national economy. And the amount of the funds held by commercial banks is very large indeed; demand deposits alone represent approximately three-fourths of the money supply in the United States.[3] Since a bank's assets must be sufficiently liquid to accommodate demand withdrawals, short-term commercial and industrial loans are the major element in bank portfolios,. thus making commercial banks the principal source of short-term business credit. Many other services are also provided by banks, but in these more or less collateral areas they receive more active competition from other financial institutions.[4]

---

[3] Samuelson, Economics (5th ed. 1961), p. 311.

[4] For example, savings and loan associations, credit unions, and other institutions compete with banks in installment lending to individuals, and banks are in competition with individuals in the personal trust field.

Deposit banking operations affect not only the volume of money and credit, but also the value of the dollar and the stability of the currency system. In this field, considerations other than simply the preservation of competition are relevant. Moreover, commercial banks are entrusted with the safekeeping of large amounts of funds belonging to individuals and corporations. Unlike the ordinary investor, these depositors do not regard their funds as subject to a risk of loss and, at least in the case of demand depositors, they do not receive a return for taking such a risk. A bank failure is a community disaster; its impact first strikes the bank's depositors most heavily, and then spreads throughout the economic life of the community.[5] Safety and soundness of banking practices are thus critical factors in any banking system.

The extensive blanket of state and federal regulation of commercial banking, much of which is aimed at limiting competition, reflects these factors. Since the Court's opinion describes, at some length, aspects of the supervision exercised by the federal banking agencies (ante, pp. 327–330), I do no more here than point out that, in my opinion, such regulation evidences a plain design grounded on solid economic considerations to deal with banking as a specialized field.

This view is confirmed by the Bank Merger Act of 1960 and its history.

Federal legislation dealing with bank mergers[6] dates from 1918, when Congress provided that, subject to the

---

[5] Since bank insolvencies destroy sources of credit, not only borrowers but also others who rely on the borrowers' ability to secure loans may be adversely affected. See Berle, Banking Under the Anti-Trust Laws, 49 Col. L. Rev. 589, 592 (1949).

[6] The term "merger" is generally used throughout this opinion to designate any form of corporate amalgamation. See note 7 in the

approval of the Comptroller of the Currency, two or more national banks could consolidate to form a new national bank;[7] similar provision was made in 1927 for the consolidation of a state and a national bank resulting in a national bank.[8] In 1952 mergers of national and state banks into national banks were authorized, also conditioned on approval by the Comptroller of the Currency.[9] In 1950 Congress authorized the theretofore prohibited[10] merger or consolidation of a national bank with a state bank when the assuming or resulting bank would be a state bank.[11] In addition, the Federal Deposit Insurance Act was amended to require the approval of the FDIC for all mergers and consolidations between insured and noninsured banks, and of specified federal banking agencies for conversions of insured banks into insured state banks if the conversion would result in the capital stock or surplus of the newly formed bank being less than that of the converting bank.[12] The Act further required insured banks merging with insured state banks to secure the approval of the Comptroller of the Currency if the assuming bank would be a national bank, and the

Court's opinion, *ante*, p. 332. Occasionally, however, as in the above paragraph, the terms "merger" and "consolidation" are used in their technical sense.

[7] 40 Stat. 1043, as amended, 12 U. S. C. (Supp. IV, 1963) § 215.

[8] 44 Stat. 1225, as amended, 12 U. S. C. (Supp. IV, 1963) § 215.

[9] 66 Stat. 599, as amended, 12 U. S. C. (Supp. IV, 1963) § 215a.

[10] See Paton, Conversion, Merger and Consolidation Legislation— "Two-Way Street" For National and State Banks, 71 Banking L. J. 15 (1954).

[11] 64 Stat. 455, as amended, 12 U. S. C. § 214a.

[12] 64 Stat. 457; see 64 Stat. 892 (now 74 Stat. 129, 12 U. S. C. (Supp. IV, 1963) § 1828 (c))

approval of the Board of Governors of the Federal Reserve System and the FDIC, respectively, if the assuming or resulting bank would be a state member bank or nonmember insured bank.[13]

None of this legislation prescribed standards by which the appropriate federal banking agencies were to be guided in determining the significance to be attributed to the anticompetitive effects of a proposed merger. As previously noted (*supra,* p. 373), Congress became increasingly concerned with this problem in the 1950's. The antitrust laws apparently provided no solution; in only one case prior to 1960, *United States* v. *Firstamerica Corp.,* Civil No. 38139, N. D. Cal., March 30, 1959, settled by consent decree, had either the Sherman or Clayton Act been invoked to attack a commercial bank merger.

Indeed the inapplicability to bank mergers of § 7 of the Clayton Act, even after it was amended in 1950, was, for a time, an explicit premise on which the Department of Justice performed its antitrust duties. In passing upon an application for informal clearance of a bank merger in 1955, the Department stated:

> "After a complete consideration of this matter, we have concluded that this Department would not have jurisdiction to proceed under section 7 of the Clayton Act. For this reason this Department does not presently plan to take any action on this matter." Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 1st Sess., Ser. 3, pt. 3, p. 2141 (1955).

---

[13] *Ibid.* However, under the Act, insured banks merging with insured state banks did not have to obtain approval unless the capital stock or surplus of the resulting or assuming bank would be less than the aggregate capital stock or surplus of all the merging banks.

And in testifying before the Senate Committee on Banking and Currency in 1957 Attorney General Brownell, speaking of bank mergers, noted:

> "On the basis of these provisions the Department of Justice has concluded, and all apparently agree, that asset acquisitions by banks are not covered by section 7 [of the Clayton Act] as amended in 1950." Hearings on the Financial Institutions Act of 1957 before a Subcommittee of the Senate Committee on Banking and Currency, 85th Cong., 1st Sess., pt. 2, p. 1030 (1957).

Similar statements were repeatedly made to Congress by Justice Department representatives in the years prior to the enactment of the Bank Merger Act.[14]

The inapplicability of § 7 to bank mergers was also an explicit basis on which Congress acted in passing the Bank Merger Act of 1960. The Senate Report on S. 1062, the bill that was finally enacted, stated:

> "Since bank mergers are customarily, if not invariably, carried out by asset acquisitions, they are exempt from section 7 of the Clayton Act. (Stock acquisitions by bank holding companies, as distinguished from mergers and consolidations, are subject to both the Bank Holding Company Act of 1956 and sec. 7 of the Clayton Act.)" S. Rep. No. 196, 86th Cong., 1st Sess. 1–2 (1959).

> "In 1950 (64 Stat. 1125) section 7 of the Clayton Act was amended to correct these deficiencies. Acquisitions of assets were included within the section,

---

[14] See Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 1st Sess., Ser. 3, pt. 1, pp. 243–244 (1955); Hearings on S. 3911 before a Subcommittee of the Senate Committee on Banking and Currency, 84th Cong., 2d Sess. 60–61, 84 (1956); Hearings on S. 1062 before the Senate Committee on Banking and Currency, 86th Cong., 1st Sess. 9 (1959).

in addition to stock acquisitions, but only in the case of corporations subject to the jurisdiction of the Federal Trade Commission (banks, being subject to the jurisdiction of the Federal Reserve Board for purposes of the Clayton Act by virtue of section 11 of that act, were not affected)." *Id.*, at 5.[15]

During the floor debates Representative Spence, the Chairman of the House Committee on Banking and Currency, recognized the same difficulty: "The Clayton Act is ineffective as to bank mergers because in the case of banks it covers only stock acquisitions and bank mergers are not accomplished that way." 106 Cong. Rec. 7257 (1960).[16]

But instead of extending the scope of § 7 to cover bank mergers, as numerous proposed amendments to that section were designed to accomplish,[17] Congress made the

---

[15] See also H. R. Rep. No. 1416, 86th Cong., 2d Sess. 5 (1960). ("The Federal antitrust laws are also inadequate to the task of regulating bank mergers; while the Attorney General may move against bank mergers to a limited extent under the Sherman Act, the Clayton Act offers little help."); *id.*, at 9 ("Because section 7 [of the Clayton Act] is limited, insofar as banks are concerned, to cases where a merger is accomplished through acquisition of stock, and because bank mergers are accomplished by asset acquisitions rather than stock acquisitions, the act offers 'little help,' in the words of Hon. Robert A. Bicks, acting head of the Antitrust Division, in controlling bank mergers.").

[16] In the Senate, a sponsor of S. 1062, Senator Fulbright, reported that the "1950 amendment to section 7 of the Clayton Act, which for the first time imposed controls over mergers by means other than stock acquisitions, did not apply to bank mergers which are practically invariably accomplished by means other than stock acquisition. Accordingly for all practical purposes bank mergers have been and still are exempt from section 7 of the Clayton Act." 106 Cong. Rec. 9711 (1960).

[17] *E. g.*, H. R. 5948, 84th Cong. 1st Sess. (1955); S. 198, 85th Cong., 1st Sess. (1957); S. 722, 85th Cong., 1st Sess. (1957); see note 1, *supra*.

deliberate policy judgment that "it is impossible to subject bank mergers to the simple rule of section 7 of the Clayton Act. Under that act, a merger would be barred. if it might .tend substantially to lessen competition, regardless of the effects on the public interest." 105 Cong. Rec. 8076 (1959) (remarks of Senator Robertson, a. sponsor of S. 1062). Because of the peculiar nature of the commercial banking industry, its crucial role in the economy, and its intimate connection with the fiscal and monetary operations of the Government, Congress rejected the notion that the general economic and business premises of the Clayton Act should be the only considerations applicable to this field. Unrestricted bank competition was thought to have been a major cause of the panic of 1907 and of the bank failures of the 1930's,[18] and was regarded as a highly undesirable condition to impose on banks in the future:

> "Banking is too important to depositors, to borrowers, to the Government, and the public generally, to permit unregulated and unrestricted competition in that field.

---

[18] S. Rep. No. 196, 86th Cong., 1st Sess. 17 (1959): "Time and again the Nation has suffered from the results of unregulated and uncontrolled competition in the field of banking, and from insufficiently regulated competition. . . . The rapid increase in the number of small weak banks, to such a large number that the Comptroller could not effectively supervise them or control any but the worst abuses, was one of the factors which led to the panic of 1907. "The banking collapse in the early 1930's again was in large part the result of insufficient regulation and control of banks, in effect the result of too much competition." See also 105 Cong. Rec. 8076 (1959): "But unlimited and unrestricted competition in banking is just not possible. We have had too many panics and banking crises and bank failures, largely as the result of excessive competition in banking, to consider for a moment going back to the days of free banking or unregulated banking."

"The antitrust laws have reflected an awareness of the difference between banking and other regulated industries on the one hand, and ordinary unregulated industries and commercial enterprises on the other hand." 106 Cong. Rec. 9711 (1960) (remarks of Senator Fulbright, a sponsor of S. 1062).

"It is this distinction between banking and other businesses which justifies different treatment for bank mergers and other mergers. It was this distinction that led the Senate to reject the flat prohibition of the Clayton Act test which applies to other mergers." *Id.,* at 9712.[19]

Thus the Committee on Banking and Currency recommended "continuance of the existing exemption from section 7 of the Clayton Act." 105 Cong. Rec. 8076 (1959). Congress accepted this recommendation; it decided to handle the problem of concentration in commercial banking "through banking laws, specially framed to fit the particular needs of the field . . . ." S. Rep. No. 196, 86th Cong., 1st Sess. 18 (1959). As finally enacted in 1960, the Bank Merger Act embodies the regulatory approach advocated by the banking agencies, vesting in them responsibility for its administration and placing the scheme within the framework of existing banking laws as an amendment to § 18 (c) of the Federal Deposit Insurance Act, 12 U. S. C. (Supp. IV, 1963), § 1828 (c).[20] It maintains the latter Act's requirement of advance approval by the appropriate federal agency for mergers between insured banks and between insured and noninsured

---

[19] See also S. Rep. No. 196, 86th Cong., 1st Sess. 16 (1959): "But it is impossible to require unrestricted competition in the field of banking, and it would be impossible to subject banks to the rules applicable to ordinary industrial and commercial concerns, not subject to regulation and not vested with a public interest."

[20] For the pertinent text of the statute, see note 8 in the Court's opinion, *ante,* pp. 332–333.

banks (*supra*, pp. 375–377), but establishes that such approval is necessary in every merger of this type. To aid the respective agencies in determining whether to approve a merger, and in "the interests of uniform standards" (12 U. S. C. (Supp. IV, 1963) § 1828 (c)), the Act requires the two agencies not making the particular decision and the Attorney General to submit to the immediately responsible agency reports on the competitive factors involved. It further provides that in addition to considering the banking factors examined by the FDIC in connection with applications to become an insured bank, which focus primarily on matters of safety and soundness,[21] the approving agency "shall also take into consideration the effect of the transaction on competition (including any tendency toward monopoly), and shall not approve the transaction unless, after considering all of such factors, it finds the transaction to be in the public interest." 12 U. S. C. (Supp. IV, 1963) § 1828 (c).

The congressional purpose clearly emerges from the terms of the statute and from the committee reports, hearings, and floor debates on the bills. Time and again it was repeated that effect on competition was *not to be the controlling factor* in determining whether to approve a bank merger, that a merger could be approved as being in the public interest even though it would cause a substantial lessening of competition. The following statement is typical:

"The committee wants to make crystal clear its intention that the various banking factors in any par-

---

[21] These factors are: "the financial history and condition of each of the banks involved, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the convenience and needs of the community to be served, and whether or not its corporate powers are consistent with the purposes of this chapter." 12 U. S. C. (Supp. IV, 1963) § 1828 (c). Compare § 6 of the Federal Deposit Insurance Act, 12 U. S. C. § 1816.

ticular case may be held to outweigh the competitive factors, and that the competitive factors, however favorable or unfavorable, are not, in and of themselves, controlling on the decision. And, of course, the banking agencies are not bound in their consideration of the competitive factors by the report of the Attorney General." S. Rep. No. 196, 86th Cong., 1st Sess. 24 (1959); *id.*, at 19, 21.[22]

The foregoing statement also shows that it was the congressional intention to place the responsibility for approval squarely on the banking agencies; the report of the Attorney General on the competitive aspects of a merger was to be advisory only.[23] And there was deliberately omitted any attempt to specify or restrict the kinds of circumstances in which the agencies might properly determine that a proposed merger would be in the public interest notwithstanding its adverse effect on competition.[24]

---

[22] See also 106 Cong. Rec. 7259 (1960): "The language of S. 1062 as amended by the House Banking and Currency Committee and as it appears in the bill we are now about to pass in the House makes it clear that the competitive and monopolistic factors are to be considered along with the banking factors and that after considering all of the factors involved, if the resulting institution will be in the public interest, then the application should be approved and otherwise disapproved."

[23] 106 Cong. Rec. 7257 (1960): "This puts the responsibility for acting on a proposed merger where it belongs—in the agency charged with supervising and examining the bank which will result from the merger. Out of their years of experience in supervising banks, our Federal banking agencies have developed specialized knowledge of banking and the people who engage in it. They are experts at judging the condition of the banks involved, their prospects, their management, and the needs of the community for banking services. They should have *primary responsibility* in deciding whether a proposed merger would be in the public interest." (Emphasis added.)

[24] H. R. Rep. No. 1416, 86th Cong., 2d Sess. 11–12 (1960): "We are convinced, also, that approval of a merger should depend on a posi-

What Congress has chosen to do about mergers and their effect on competition in the highly specialized field of commercial banking could not be more "crystal clear." (*Supra*, p. 382.) But in the face of overwhelming evidence to the contrary, the Court, with perfect equanimity, finds "uncertainty" in the foundations of the Bank Merger Act (*ante*, p. 349) and on this premise puts it aside as irrelevant to the task of construing the scope of § 7 of the Clayton Act.

I am unable to conceive of a more inappropriate case in which to overturn the considered opinion of all concerned as to the reach of prior legislation.[25] For 10 years everyone—the department responsible for antitrust law enforcement, the banking industry, the Congress, and the bar—proceeded on the assumption that the 1950 amendment of the Clayton Act did not affect bank mergers. This assumption provided a major impetus to the enactment of remedial legislation, and Congress, when it finally settled on what it thought was the solution to the problem at hand, emphatically rejected the remedy now brought to life by the Court.

The result is, of course, that the Bank Merger Act is almost completely nullified; its enactment turns out to have been an exorbitant waste of congressional time and energy. As the present case illustrates, the Attorney General's report to the designated banking agency is no longer truly advisory, for if the agency's decision is not

tive showing of some benefit to be derived from it. As previously indicated, your committee is not prepared to say that the cases enumerated in the hearings are the only instances in which a merger is in the public interest, nor are we prepared to devise a specific and exclusive list of situations in which a merger should be approved."

[25] Compare *State Board of Ins.* v. *Todd Shipyards Corp.*, 370 U. S. 451, 457, in which this Court refused to reconsider certain prior decisions because Congress had "posited a regime of state regulation" of the insurance business on their continuing validity. Cf. *Toolson* v. *New York Yankees, Inc.*, 346 U. S. 356.

satisfactory a § 7 suit may be commenced immediately.[26] The bank merger's legality will then be judged solely from its competitive aspects, unencumbered by any considerations peculiar to banking.[27] And if such a suit were deemed to lie after a bank merger has been consummated, there would then be introduced into this field, for the first time to any significant extent, the threat of divestiture of assets and all the complexities and disruption attendant upon the use of that sanction.[28] The only vestige of the Bank Merger Act which remains is that the banking agencies will have an initial veto.[29]

---

[26] If a bank merger such as this falls within the category of a "stock" acquisition, a § 7 suit to enjoin it may be brought not only by the Attorney General, but by the Federal Reserve Board as well. See § 11 of the Clayton Act, 15 U. S. C. § 21 (vesting authority in the Board to enforce § 7 "where applicable to banks"). In an attempt to retain some semblance of the structure erected by Congress in the Bank Merger Act, the Court states that it "supplanted ... whatever authority the FRB may have acquired under § 11, by virtue of the amendment of § 7, to enforce § 7 against bank mergers." Ante, p. 344, note 22. Since both the Attorney General and the Federal Reserve Board have purely advisory roles where a bank merger will result in a national bank, the Court's reasoning with respect to the effect of the Bank Merger Act upon enforcement authority should apply with equal force to both.

[27] Indeed the Court has erected a simple yardstick in order to alleviate the agony of analyzing economic data—control of 30% of a commercial banking market is prohibited. Ante, pp. 363–364.

[28] Although § 7 of the Clayton Act is applicable to an outright purchase of bank stock, this form of amalgamation is infrequently used in the banking field and does not involve divestiture problems of the same magnitude as does an asset acquisition.

[29] It is true, as the Court points out (ante, p. 354), that Congress, in enacting the Bank Merger Act, agreed that the applicability of the Sherman Act to banking should not be disturbed. See, e. g., 105 Cong. Rec. 8076 (1959). But surely this alone provides no conceivable justification for applying the Clayton Act as well. Apart from the fact that the Sherman Act covers many kinds of restraints besides mergers, one of the sponsors of the Bank Merger Act (Senator Fulbright) expressed his expectation that in a Sherman Act

This frustration of a manifest congressional design is, in my view, a most unwarranted intrusion upon the legislative domain. I submit that *whatever* may have been the congressional purpose in 1950, Congress has now so plainly pronounced its current judgment that bank mergers are not within the reach of § 7 that this Court is duty bound to effectuate its choice.

But I need not rest on this proposition, for, as will now be shown, there is nothing in the 1950 amendment to § 7 or its legislative history to support the conclusion that Congress even then intended to subject bank mergers to this provision of the Clayton Act.

## II.

Prior to 1950, § 7 of the Clayton Act read, in pertinent part, as follows:

"That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of

---

case a bank merger would not be subjected to strict antitrust standards to the exclusion of all other considerations: "And even if the Sherman Act is held to apply to banking and to bank mergers, it seems clear that under the rule of reason spelled out in the Standard Oil case, different considerations will be found applicable, in a regulated field like banking, in determining whether activities would 'unduly diminish competition,' in the words of the Supreme Court in that case." 106 Cong. Rec. 9711 (1960). Moreover, this Court has recognized in other areas that it may be necessary to accommodate the Sherman Act to regulatory policy. *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 83; *Federal Communications Comm'n* v. *RCA Communications, Inc.,* 346 U. S. 86, 91–92. See also *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 527. And of course the Sherman Act is concerned more with existing anticompetitive effects than with future probabilities, and thus would not reach incipient restraints to the same extent as would § 7 of the Clayton Act. See *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 317–318 and notes 32, 33.

such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

In 1950 this section was amended to read (the major amendments being indicated in italics):

"That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital *and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets* of another corporation engaged also in commerce, where *in any line of commerce in any section of the country,* the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

If Congress did intend the 1950 amendment to reach bank mergers, it certainly went at the matter in a very peculiar way. While prohibiting asset acquisitions having the anticompetive effects described in § 7, it limited the applicability of that provision to corporations subject to the jurisdiction of the Federal Trade Commission, which does not include banks. And it reenacted the stock-acquisition provision in the very same language which—as it was fully aware—had been interpreted not to reach the type of merger customarily used in the banking industry. See *infra,* pp. 389–393. In the past this Court has drawn the normal inference that such a reenactment indicates congressional adoption of the prior judicial statutory construction. *E. g., United States* v. *Dixon,* 347 U. S. 381; *Overstreet* v. *North Shore Corp.,* 318 U. S. 125, 131–132.

In this instance, however, the Court holds that the stock-acquisition provision underwent an expansive metamorphosis, so that it now embraces all mergers or consolidations involving an exchange of stock. Since bank mergers usually, if not always, do involve exchanges of stock, the effect of this construction is to rob the Federal Trade Commission provision relating to asset acquisitions of all force as a substantive limitation upon the scope of § 7; according to the Court the purpose of that provision was merely to ensure the Commission's role in the enforcement of § 7. *Ante,* pp. 346–348. In short, under this reasoning bank mergers to all intents and purposes are fully within the reach of § 7.

A more circumspect look at the 1950 amendment of § 7 and its background will show that this construction is not tenable.

The language of the stock-acquisition provision itself is hardly congenial to the Court's interpretation. The PNB-Girard merger is technically a consolidation, governed by § 20 of the national banking laws, 12 U. S. C. (Supp. IV, 1963) § 215. Under that section, the corporate existence of both PNB and Girard, all of their rights, franchises, assets, and liabilities, would be automatically vested in the resulting bank, which would operate under the PNB charter. PNB itself would acquire nothing. Rather, the two banks would be creating a new entity by the amalgamation of their properties, and the subsequent conversion of Girard stock (which would then represent ownership in a nonfunctioning entity) into stock of the resulting bank would simply be part of the mechanics by which ownership in the new entity would be reflected. Clearly this is not a case of a corporation acquiring the stock of another functioning corporation, which is the only situation where "the *effect* of . . . [a stock] acquisition may be substantially to lessen competition." (Emphasis added.)

There are further crucial differences between a merger and a stock acquisition. A merger normally requires public notice and the approval of the holders of two-thirds of the outstanding shares of each corporation, and dissenting shareholders have the right to receive in cash the appraised value of their shares.[30] A purchase of stock may be done privately, and the only approval involved is that of the individual parties to the transaction. Unlike a merged company, a corporation whose stock is acquired usually remains in business as a subsidiary of the acquiring corporation.[31]

The Government, however, contends that a merger more closely resembles a stock acquisition than an asset acquisition because of one similarity of central importance: the acquisition by one corporation of an immediate voice in the management of the business of another corporation. But this is obviously true a fortiori of asset acquisitions of sufficient magnitude to fall within the prohibition of § 7; if a corporation buys the plants, equipment, inventory, etc., of another corporation, it acquires absolute control over, not merely a voice in the management of, another business.

The legislative history of the 1950 amendment also unquestionably negates any inference that Congress in-

---

[30] In these respects a merger is precisely the contrary of what § 7 was originally designed to proscribe—the secret acquisition of corporate control. See the Court's opinion, ante, p. 338.

[31] That the stock-acquisition provision was not intended to cover mergers is strongly suggested by the second paragraph of § 7: "No corporation shall acquire . . . any part of the stock . . . of one or more corporations . . . where . . . the effect . . . of the use of such stock by the voting or granting of proxies . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U. S. C. § 18. (Emphasis added.) After a merger has been consummated, the resulting corporation holds no stock in any party to the merger; thus there can be in this situation no such thing as a restraint of trade by "the use" of the voting power of acquired stock.

tended to reach bank mergers. It is true that the purpose was "to plug a loophole" in § 7 (95 Cong. Rec. 11485 (1949) (remarks of Representative Celler)). But simply to state this broad proposition does not answer the precise questions presented here: what was the nature of the loophole sought to be closed; what were the means chosen to close it?

The answer to the latter question is unmistakably indicated by the relationship between the 1950 amendment and previous judicial decisions. In *Arrow-Hart & Hegeman Elec. Co.* v. *Federal Trade Comm'n,* 291 U. S. 587, this Court, by a divided vote, ruled on the scope of the Federal Trade Commission's remedial powers under the original Clayton Act. After the Commission had issued a § 7 complaint against a holding company which had been formed by the stockholders of two manufacturing corporations, steps were taken to avoid the Commission's jurisdiction. Two new holding companies were formed, each acquired all the common stock of one of the manufacturing companies, and each issued its stock directly to the stockholders of the original holding company. This company then dissolved and the two new holding companies and their respective manufacturing subsidiaries merged into one corporation. This Court held that the Commission had no authority, after the merger, to order the resulting corporation to divest itself of assets. An essential part of this holding was that the merger in question, which was technically a consolidation similar to that here planned by PNB and Girard, was not a stock acquisition within the prohibitions of § 7: "If the merger of the two manufacturing corporations and the combination of their assets was in any respect a violation of any antitrust law, as to which we express no opinion, it was necessarily a violation of statutory prohibitions other

than those found in the Clayton Act." 291 U. S., at 599; see *id.*, at 595.[32]

This decision, along with two others earlier handed down by this Court (*Thatcher Mfg. Co.* v. *Federal Trade Comm'n* and *Swift & Co.* v. *Federal Trade Comm'n,* decided together with *Federal Trade Comm'n* v. *Western Meat Co.,* 272 U. S. 554), perhaps provided more of a spur to enactment of the "assets" amendment to § 7 than any other single factor. These decisions were universally regarded as opening the unfortunate loophole whereby § 7 could be evaded through the use of an asset acquisition. Representative Celler expressed the view of Congress in this fashion:

> "The result of these decisions has so weakened sections 7 and 11 . . . as to give to the Federal Trade Commission and the Department of Justice merely a paper sword to prevent improper mergers." 95 Cong. Rec. 11485 (1949).[33]

[32] On this point, the dissenters agreed: "It is true that the Clayton Act does not forbid corporate mergers . . . ." 291 U. S., at 600. See also *United States* v. *Celanese Corp. of America,* 91 F. Supp. 14.

[33] See also Hearings on H. R. 988, H. R. 1240, H. R. 2006, H. R. 2734 before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st Sess. 38–39 (1949); Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 109–110 (1950): "The loophole sought to be filled resulted from a series of Supreme Court decisions. (*Swift & Co.* v. *FTC* and *Thatcher Mfg. Co.* v. *FTC* (272 U. S. 554); *Arrow-Hart & Hegeman Co.* v. *FTC* (291 U. S. 587).) In these decisions the Supreme Court held that section 7 of the Clayton Act, while prohibiting the acquisition of stock of a competitor, gave the Federal Trade Commission no authority under section 11 to order divestiture of assets which had been acquired before a cease-and-desist order was issued, even though the acquisition resulted from the voting of illegally held stock."

Since this Court's decisions were cast in terms of the scope of the Federal Trade Commission's jurisdiction, Congress, in amending § 7 so as to close that gap, emphasized its expectation—made plain in the committee reports, hearings, and debates—that the Commission would assume the principal role in enforcing the section.[34]  Implicit here is that no change in the enforcement powers of the other agencies named in § 11 was contemplated.[35]  Of more importance, the legislative history demonstrates that it was the asset-acquisition provision that was designed to plug the loophole created by *Thatcher, Swift,* and *Arrow.*  Although *Arrow,* unlike *Thatcher* and *Swift,* involved a consolidation of the same type as the PNB-Girard merger, the members of Congress drew no distinction among these cases, invariably discussing all three of them in the same breath as examples of asset acquisitions.[36]  Indeed, the House report stated that

> "the Supreme Court . . . held [in *Arrow*] that if an acquiring corporation secured *title to the physical assets* of a corporation whose stock it had acquired before the Federal Trade Commission issues its final order, the Commission lacks power to direct divestiture of the physical assets . . . ."  H. R. Rep. No. 1191, 81st Cong., 1st Sess. 5 (1949).  (Emphasis added.)

And on the Senate floor it was pointed out that "the *method* by which . . . [the merger in *Arrow*] had been

---

[34] The Federal Trade Commission had assumed primary enforcement responsibility before the 1950 amendment. See Martin, Mergers and the Clayton Act (1959), p. 197.

[35] Compare note 26, *supra.*

[36] See note 33 *supra;* Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 97 (1950).  And this Court has, after the 1950 amendment, described *Arrow* as a case involving an asset acquisition.  *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 313 and note 20.

accomplished was an innocent one . . . ." 96 Cong. Rec. 16505 (1950). (Emphasis added.) Clearly the understanding of Congress was that a consolidation of two corporations was an acquisition of assets.[37]

Nor did Congress act inadvertently or without purpose in limiting the asset-acquisition provision to corporations subject to the jurisdiction of the Federal Trade Commission, thereby excluding bank mergers. The reports, hearings, and debates on the 1950 amendment reveal that Congress was then concerned with the rising tide of *industrial* concentration—*i. e.*, "the external expansion . . . through mergers, acquisitions, and consolidations"[38] of corporations engaged in manufacturing, mining, merchandising, and of other kindred commercial endeavors. Specialized areas of the economy such as banking were not even considered. Thus the Federal Trade Commission's 1948 report on mergers recounted the statistics on concentration in a multitude of industries— *e. g.*, steel, cement, electrical equipment, food and dairy products, tobacco, textiles, paper, chemicals, rubber—but included not one figure on banking concentration.[39] This report was repeatedly cited and heavily relied on by members of Congress and others to demonstrate the mag-

---

[37] The single excerpt quoted by the Court (*ante*, p. 345) casts no doubt on this proposition, for Senator Kilgore's remark occurred in the course of a discussion in which he was trying to make the point that there is no difference in *practical* effect, as opposed to the legal distinction, between a merger and a stock acquisition. Thus at the end of the paragraph quoted by the Court the Senator stated: ". . . I cannot see how on earth you can get the idea that the purchase of the stock of the corporation, all of it, does not carry with it the transfer of all of the physical assets in that corporation." Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 176 (1950).

[38] H. R. Rep. No. 1191, 81st Cong., 1st Sess. 2 (1949).

[39] Federal Trade Commission, The Merger Movement: A Summary Report (1948), *passim*.

nitude of the merger movement and the economic dangers it presented.[40] In the committee hearings the focus was exclusively upon amalgamation in the ordinary commercial fields,[41] and similarly the Senate and House reports spoke solely of industrial concentration as the evil to be remedied.[42] On the floor of the House, Representative Celler indicated the extent of concentration of industrial power:

> "Four companies now have 64 percent of the steel business, four have 82 percent of the copper business, two have 90 percent of the aluminum business, three have 85 percent of the automobile business, two have 80 percent of the electric lamp business, four have 75 percent of the electric refrigerator business, two have 80 percent of the glass business, four have 90 percent of the cigarette business, and so forth.
>
> "The antitrust laws are a complete bust unless we pass this bill." 95 Cong. Rec. 11485 (1949).

The legislatory history is thus singularly devoid of any evidence that Congress sought to deal with the special problem of banking concentration.

I do not mean to suggest, of course, that § 7 of the Clayton Act is thereby rendered applicable only to ordinary commercial and industrial corporations and not to firms in any "regulated" sector of the economy. The

---

[40] E. g., Hearings on H. R. 988, H. R. 1240, H. R. 2006, H. R. 2734 before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st Sess. 39–40 (1949); 95 Cong. Rec. 11503 (1949); 96 Cong. Rec. 16505 (1950).

[41] Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 5–6, 17, 57–59 (1950); Hearings on H. R. 988, H. R. 1240, H. R. 2006, H. R. 2734 before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st Sess. 40, 113 (1949).

[42] S. Rep. No. 1775, 81st Cong., 2d Sess. 3 (1950); H. R. Rep. No. 1191, 81st Cong., 1st Sess. 2–3 (1949).

point is that when Congress included in § 7 asset acquisitions by corporations subject to the Federal Trade Commission's jurisdiction, and at the same time continued in § 11 the Federal Reserve Board's jurisdiction over banks, it was not acting irrationally. Rather, the absence of any mention of banks in the legislative history of the 1950 amendment, viewed in light of the prior congressional treatment of banking as a distinctive area with special characteristics and needs, compels the conclusion that bank mergers were simply not then regarded as part of the loophole to be plugged.[43]

This conclusion is confirmed by a number of additional considerations. It was not until *after* the passage of the 1950 amendment of § 7 that Representative Celler, its co-sponsor, requested the staff of the Antitrust Subcommittee of the House Committee on the Judiciary "to prepare a report indicating the concentration existing in our banking system." Staff of Subcommittee No. 5, House Committee on the Judiciary, 82d Cong., 2d Sess., Report on Bank Mergers and Concentration of Banking Facilities III (1952). The introduction to the report reveals that:

> "On March 21, 1945, the Board of Governors of the Federal Reserve System wrote to the chairman of the Committee on the Judiciary requesting that the provisions of H. R. 2357, Seventy-ninth Congress, first session, one of the early predecessors of the Celler Antimerger Act, be extended so as to include corporations subject to the jurisdiction of the Federal Reserve Board under section 11 of the Clayton Act. Because of the revisions made in subsequent versions of antimerger bills, however, it became impracticable

---

[43] It is interesting to note that in the same year in which § 7 was amended Congress passed an act *facilitating* certain kinds of bank mergers which had theretofore been prohibited. See note 11, *supra*, and accompanying text.

to include within the scope of the act corporations other than those subject to regulation by the Federal Trade Commission. Banks, which are placed squarely within the authority of the Federal Reserve Board by section 11 of the Clayton Act, ᵢ ᵣe therefore circumscribed insofar as mergers are concerned only by the old provisions of section 7, and certain additional statutes which do not presently concern themselves substantively with the question of competition in the field of banking." Id., at VII.

It is also worth noting that in 1956 Representative Celler himself introduced another amendment to § 7, explaining that "all the bill [H. R. 5948] does is plug a loophole in the present law dealing with bank mergers . . . . This loophole exists because section 7 of the Clayton Act prohibits bank mergers . . . only if such mergers are accomplished by stock acquisition." 102 Cong. Rec. 2109 (1956). The bill read in pertinent part: "[N]o bank . . . shall acquire . . . the whole or any part of the assets of another corporation engaged also in commerce . . . ." Ibid. The amendment passed the House but was defeated in the Senate.

For all these reasons, I think the conclusion is inescapable that § 7 of the Clayton Act does not apply to the PNB-Girard merger. The Court's contrary conclusion seems to me little better than a tour de force.[44]

Memorandum of MR. JUSTICE GOLDBERG.

I agree fully with my Brother HARLAN that § 7 of the Clayton Act has no application to bank mergers of the type involved here, and I therefore join in the conclusions expressed in his opinion on that point. However, while I

---

[44] Since the Court does not reach the Sherman Act aspect of this case, it would serve no useful purpose for me to do so.

thus dissent from the Court's holding with respect to the applicability of the Clayton Act to this merger, I wish to make clear that I do not necessarily dissent from its judgment invalidating the merger. To do so would require me to conclude in addition that on the record as it stands the Government has failed to prove a violation of the Sherman Act, which is fully applicable to the commercial banking business. In my opinion there is a substantial Sherman Act issue in this case, but since the Court does not reach it and since my views relative thereto would be superfluous in light of today's disposition of the case, I express no ultimate conclusion concerning it. Compare *Rescue Army* v. *Municipal Court of Los Angeles,* 331 U. S. 549, 585 (Murphy, J., dissenting); *Poe* v. *Ullman,* 367 U. S. 497, 555 (STEWART, J., dissenting).